**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | |
|---|---|
| MALIBU MEDIA, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) 8:13-cv-03007-JSM-TBM |
| | ) |
| ROBERTO ROLDAN, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S MOTION TO DISMISS ACTION**
**WITH MOTION TO STRIKE INADMISSIBLE EVIDENCE FROM COMPLAINT**
**WITH INCORPORATED MEMORANDUM OF LAW**

COMES NOW Defendant ROBERTO ROLDAN, by and through his undersigned attorney, and moves this Honorable Court, pursuant to Rules 12(b) and (f) to strike all inadmissible evidence from Plaintiff's complaint and **DISMISS** the instant action.

I.   **Introduction**

February 8, 2012, was a monumental date for Plaintiff. Essentially, it was Malibu Media's birthday: the day the company was created.[1]  It was also the date when Malibu Media filed its very first six lawsuits, Case Nos. 2:12-cv-00664, 2:12-cv-00665, 2:12-cv-00665, 2:12-cv-00667, and 2:12-cv-00668 (all in the Eastern District of Pennsylvania), all against

_____

[1] See California Secretary of State, http://kepler.sos.ca.gov/ (select "Business Entities," then "Business Search," then search for limited liability company "Malibu Media") (showing Entity Name: Malibu Media, LLC; Entity No. 201103910088; Date filed: 02/08/2011).

unidentified John Does for alleged copyright infringement via BitTorrent downloading.

Since then, Malibu Media has filed in the federal courts 2,402[2] lawsuits,[3] which number grows at an alarming rate, with hundreds of new cases filed in the last month.[4]  In all its lawsuits, Malibu Media targets alleged individual file sharers rather than the *initial seeders*, or those who uploads the films to the BitTorrent stream in the first place.

> Failure to differentiate [between the initial seeder and subsequent downloaders] casts a wide net because it does not focus on the root cause.  The focus in BitTorrent copyright infringement cases should be on the initial seeder, or the individual who first made the file available on the web.

---

[2] Pacer.gov (last check June 25, 2014).

[3] *See also* Gabe Friedman, *The Biggest Filer of Copyright Lawsuits? This Erotica Web Site*, NEW YORKER (Mar. 15, 2014), available at http://www.newyorker.com/online/blogs/currency/2014/05/the-biggest-filer-of-copyright-lawsuits-is-this-erotica-web-site.html; Mike Masnik, *One Single Porn Copyright Troll, Malibu Media, Accounted For Nearly 40% Of All Copyright Lawsuits This Year,* TECHDIRT (May 19, 2014), at http://www.techdirt.com/articles/20140517/06552727268/one-single-porn-copyright-troll-malibu-media-accounted-nearly-40-all-copyright-lawsuits-this-year.shtml ("Of 872 copyright claims filed in the first quarter of 2014, 343 of them were from Malibu Media").

[4] The litigation-as-a-business nature of Malibu Media's numerous lawsuits is highlighted in the efforts taken by legitimate movie studios and music labels to reduce copyright infringement.  While Malibu Media has made a business out of targeting individual BitTorrent users, legitimate companies are working with Internet Service Providers to reduce the frequency of illegal file sharing.  *See* Verizon Copyright Alert Program, at http://www.verizon.com/Support/Residential/Dotnetcontexthelp/DotNetContextHelp.htm (explaining that "Verizon joined agreement with other ISPs, music labels, and movie studios to develop a new Copyright Alert Program").  In contrast, Malibu Media merely files lawsuits.

> Finding and curing the root of the problem is essential to remedying the entire system.

Jeannie Roebuck, *BitTorrent Sharing: The Case Against the John Does*, 18 INTELL. PROP. L. BULL. 35, 55-56 (Fall 2013)[5]

In truth, the instant case is in many ways near identical to these other suits. Even though the pleadings have been cleaned up, with one Defendant per case, all suits, upon information and belief, have been based on facts obtained from Malibu Media's investigator/expert, Tobias Fieser and IPP International UG, which, as is discussed in more detail below, has a *contingency-fee relationship* with Malibu Media.

One thing, however, is slightly different from the other cases: The instant Defendant, Mr. Roldan, is not an Internet accountholder; rather, he is the accountholder's son. Although, on the alleged download dates, Mr. Roldan did not actually reside in the home where the Internet connection

---

[5] *See also* SJD, *Why do copyright trolls ignore the big fish?* at http://fightcopyrighttrolls.com/2014/06/08/why-do-copyright-trolls-ignore-the-big-fish-initial-seeders/, explaining in part:

> I monitored X-Art's new releases for a month, and found out that **their clips appear on the Pirate Bay almost exactly two hours after the release.** The overwhelming majority of these releases are seeded by a highly active user named Drarbg, presumably a bot that aggregates pirated content from other sources. Whoever operates this bot must be linked to someone who has access to the client area of the xart.com: if not an insider, then at least a person that paid for a subscription. So, are there ways to figure out who is the source of daily leaks? If so, is such investigation affordable? The answer is *yes* to both questions.

existed for the subject IP address, Malibu Media targeted him because on Facebook he had "liked" some of the same television shows and music Malibu Media's "investigator" identified as being also downloaded from the subject IP address, including *Breaking Bad*[6], which has 9.8 million "likes" on Facebook; *Scrubs*[7], which has 12.9 million likes; *Lost*[8], which has 10.696 million likes; *Weeds*[9], which has 5.6 million likes; *Futurama*[10], which has 29 million likes; The Beatles[11], which has "41 million likes; Pink Floyd[12], which has 28.8 million likes; and *Star Wars*[13], which has 12.2 million likes.  Other than these Facebook "likes," Malibu Media has no other evidence linking Mr. Roldan, personally, to the alleged download.

## II.  Allegations pertaining to an IP address are not enough to identify an infringing individual

On March 20, 2014, in a very similar case, the Honorable Ursula Ungaro of the Southern District of Florida entered an order dismissing Malibu Media's Case No. 1:14-cv-20213-UU [Doc. 10] (Copy at **Exhibit "1"**).  Judge Ungaro had therein issued a

---

[6] https://www.facebook.com/BreakingBad
[7] https://www.facebook.com/scrubs
[8] https://www.facebook.com/LOST
[9] https://www.facebook.com/Weedsonshowtime
[10] https://www.facebook.com/Futurama
[11] https://www.facebook.com/thebeatles
[12] https://www.facebook.com/pinkfloyd
[13] https://www.facebook.com/StarWars

show-cause order[14] requiring Malibu Media to show good cause why the Court should reasonably rely on its use technologies to establish the defendant's identity.  After considering Malibu Media's response, Judge Ungaro entered an order dismissing the case, explaining:

> Plaintiff has not shown how this geolocation software can establish the identity of the Defendant.  There is nothing that links the IP address location to the identity of the person actually downloading and viewing Plaintiff's videos, and establishing whether that person lives in this district. . . . Even if this IP address is located within a residence, the geolocation software cannot identify who has access to that residence's computer and who would actually be using it to infringe Plaintiff's copyright.

Exh. "1."[15]  Next, on April 4, 2014, in another *Malibu Media v. Doe* case, Case No. 14-20216-FAM, Judge Federico A. Moreno entered an order to show cause (copy at **Exhibit "2"**), therein following Judge Ungaro's order and requiring Malibu Media to show cause why the court should rely on its software.  Judge Moreno's order was a deviation from at least one previous order, Case No. 1:14-cv-20218-FAM (S.D. Fla. Jan. 31, 2014). In other words, Judge Ungaro's order was a game changer.

---

[14] Doc. 7 in 1:14-cv-20213-UU (March 5, 2014).

[15] Judge Ungaro also filed show-cause orders in near-identical cases, numbered 0:14-cv-60681-UU [Doc. 5] and 0:14-cv-60682-UU [Doc. 5], after which Malibu Media filed notices of voluntary dismissal.

Judges Ungaro and Moreno are not alone in their finding. In January, a district judge in Seattle entered an order of dismissal because "simply identifying the account holder associated with an IP address tells us very little about who actually downloaded *Elf-Man* using that IP address." *Elf-Man, LLC v. Cariveau*, 2014 WL 202096, No. C13-0507RSL (Jan. 17, 2014). One reason is that, with each Defendant identified only by an IP address, "the assumption that the person who pays for Internet access at a given location is the same individual who allegedly downloaded a single sexually explicit film is tenuous." *In Re: BitTorrent Adult Film Copyright Infringement Cases*, No. 11-cv-03995, 2012 WL 1570765, 2012 U.S. Dist. LEXIS 61447 (E.D.N.Y. May 1, 2012). Due to the increasing popularity of wireless routers, identifying a computer user by an IP address is unlikely, as different family members, visitors, or even neighbors could have performed the alleged downloads. *Id*. One court observed that as many as "30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material." *Digital Sin, Inc. v. Does 1-176,* 2012 WL 263491 *3 (S.D.N.Y. Jan. 30, 2012).

In an effort to legitimize its techniques, Malibu Media may argue that federal law enforcement rely on the same technology. However, it is well known that law enforcement

officers rely upon more than just an IP address before suspecting someone of a crime.   They take steps to determine also MAC addresses and make lengthy investigations on suspects' routers.   In one case involving child pornography, a federal court adopted the following view on IP addresses:

> Much, if not all, of the cyber-evidence (the E-mail addresses and IP addresses used) will lead you to an innocent person. That's why simply identifying which account was used to commit a crime does not provide you with probable cause to get a search or arrest warrant for the name and address on that account. You'll need to do more investigating to determine if there is a link between the account holder (or other members of the household) with the criminal activity that was committed with that account.

*Chism v. Wash. State*, 655 F.3d 1106, 1116 (9th Cir. 2011).   In the same manner, several federal courts of appeals require more than just an IP address.   These courts require evidence that a specific user of a computer employing the particular IP address possessed or transmitted child pornography.[16]   Moreover, unlike Malibu Media's experts, federal law enforcement officers are

---

[16] *See United States v. Vosburgh*, 602 F.3d 512, 526-27 (3d Cir. 2010); *United States v. Stults*, 575 F.3d 834, 843-44 (8th Cir. 2009); *United States v. Perrine*, 518 F.3d 1196, 1205-06 (10th Cir. 2008); *United States v. Perez*, 484 F.3d 735, 738-40 (5th Cir. 2007); *United States v. Wagers*, 452 F.3d 534, 539 (6th Cir. 2006)); *United States v. Hay*, 231 F.3d 630, 634-35 (9th Cir. 2000); *United States v. Bynum*, 604 F.3d 161, 165 (4th Cir. 2010).

properly licensed.

### III. <u>Malibu Media's case is based on unlawfully obtained information which is inadmissible as evidence</u>

Next, all the information used to base Malibu Media's claim against Defendant should be stricken because it was obtained unlawfully. Without this information, Malibu Media's amended complaint would be stripped down to nothing and therefore subject to dismissal. Malibu Media's entire factual basis against Defendant is derived from an inadmissible report conducted by Plaintiff's "investigator"/expert, Mr. Tobias Fieser of IPP International UG, an unlicensed entity improperly engaging in regulated activities, including "the business of providing forensic investigation services to copyright owners." (Doc. 3-5 ¶ 5.) Because Mr. Fieser's investigation results are Malibu Media's entire case[17] and therefore massively prejudicial to Defendant, this evidence is hugely important to consider early in the proceedings.

Mr. Fieser's data is inadmissible, and should be stricken, for the reasons that follow.

### A. <u>Mr. Fieser's fee relationship with Malibu Media is in part contingent upon Malibu Media's recovery</u>

---

[17] Malibu Media alleges in its complaint that its "investigator, IPP International UG, established a direct TCP/IP connection with the Defendant's IP address" (Doc. 11 ¶ 17) and "downloaded from Defendant one or more bits of each of the digital movie files identified by the file hashes on [Plaintiff's] Exhibit A." (Doc. 11 ¶ 18).

The first reason Mr. Fieser's data should be stricken is that he is an expert witness whose fee is at least in part contingent upon Malibu Media's settlement. Recent evidence uncovered in near-identical Malibu Media cases in other jurisdictions reveals that Malibu Media's relationship with Mr. Fieser is based on an oral contingency-fee agreement. Like the instant case, these other Malibu Media cases are filed against Internet subscribers and based entirely on Mr. Fieser's declarations and investigations.

Attached as **Exhibit "3"** to this motion is a declaration by Mr. Morgan Pietz,[18] a California-barred attorney who has represented numerous defendants in near-identical Malibu Media cases outside Florida.[19] (The declaration's exhibits are attached hereto **Exhibits 4-29.**) The declaration details an interrogatory propounded last year on Malibu Media in *Malibu Media, LLC v. John Doe*, N.D. Ill. No. 1:13-cv-6312, which asked

---

[18] Before this case, Mr. Pietz's declaration was filed in other *Malibu Media, LLC v. Doe* cases filed in the District of Maryland, Case Nos. 1:14-cv-0223-MJG, 1:14-cv-0257-CCB, and 1:14-cv-0263-RDB.

[19] Mr. Pietz has represented defendants in other, similar BitTorrent cases, the most notable of which is *Ingenuity 13 LLC v. John Doe*, 2:12-cv-8333-ODW JCX, 2013 WL 1898633 (C.D. Cal. 2013), *appeal dismissed* (Nov. 18, 2013), which case made national headlines a year ago when sanctions were issued against the "porno-trolling collective" of attorneys who had formed AF Holdings and Ingenuity 13 entities "for the sole purpose of litigating copyright-infringement lawsuits." *Id.*

Malibu Media to identify "all persons or business entities that have an interest, financially or otherwise, in this litigation. . . ." (Exh. 3 at 6, Exh. 4 at 5).  In its answer, verified on December 3, 2013, by one of Malibu Media's owners, Ms. Colette Field, Malibu explained, "**Pursuant to an oral contingency fee agreement, IPP International UG is entitled to a small portion of the proceeds from the resolution of this case in consideration for the services it provided**." (Exh. 3 at 5; Exh. 4 at 6).  Mr. Pietz also references another interrogatory, answered December 3, 2013, in *Malibu Media, LLC v. Hinds*, 1:12-cv-1117-WTL-DML (S.D. Ind.) that had inquired into Malibu's agreement with IPP, to which Malibu answered, "Plaintiff and IPP International have an oral agreement that was formed approximately 2.5 years ago. *This agreement has not ever been modified or amended*. The terms of this agreement are confidential and constitute a trade secret." (Exh. 3 at 5, citing to Exhibit C, p. 5 (here, Exh. 4 at 19)).

These interrogatory answers show clearly that Malibu Media's payment arrangement with Mr. Fieser/IPP is and has been a contingency-fee arrangement.  The data on which Malibu Media relies for the instant case was obtained by Mr. Fieser/IPP between August 17 and November 17, 2013, as shown in Mr. Fieser's declaration (Doc. 3-5 at 3 ¶ 17) (see also "Hit Dates"

at Doc. 8-1).   Therefore, by the date Ms. Field verified the above-quoted interrogatory answers, Mr. Fieser/IPP was already finished "investigating" the instant Defendant's IP address.

If indeed Mr. Fieser/IPP — whose data, as said before, is the entire basis of Malibu Media's case — is a contingent-fee witness, his testimony on which this case is based is unreliable and inadmissible.   First, contingent-fee witnesses are simply not legal.   Pursuant to Rule 4-3.4(b), Rules Regulating The Florida Bar, a lawyer may not enter into a contingent fee agreement with an expert witness (but may pay an expert a reasonable *noncontingent* fee).   *See also* 18 U.S.C. § 201(c)(2) (making it illegal to give or offer "anything of value to any person, for or because of the testimony under oath or to be given by such person as a witness" in any court proceeding).   Furthermore, because a contingent-fee witness is naturally biased, his testimony is inadmissible.   *See, e.g.*, *Straughter v. Raymond*, 2011 WL 1789987, 2011 U.S. Dist. LEXIS 53195 at *9-10 (C.D. Cal. May 9, 2011) (collecting cases and holding that a contingent fee expert was *per se* excluded); *In re Mushroom Transp. Co. Inc.*, 70 B.R. 416, 418 (Bankr. E.D. Pa. 1987) (precluding an expert witness employed under a contingent fee agreement from testifying unless the method of compensation was altered); *Gediman v. Sears, Roebuck & Co.*, 484 F. Supp.

1244, 1248 (D. Mass. 1980) (stating it would have excluded expert appraisal testimony on valuation had it initially appeared that the witness had been compensated for his appraisal on a contingent fee basis); *City & Cnty. of Denver, Colo. v. Bd. of Assessment Appeals of State of Colo.*, 947 P.2d 1373, 1379 (Colo. 1997) (recognizing the "settled principle of American law: expert witnesses should not receive contingent fees"). The reason for this rule is that "[a]n agreement to give an opinion on a contingent basis, particularly on an arithmetic scale, attacks the very core of expert testimony." *Gediman*, 484 F. Supp. at 1248. *Accord, Accrued Fin. Servs., Inc. v. Prime Retail, Inc.*, 2000 WL 976800 *3 n.3 (D. Md. 2000) ("Financial arrangements that provide incentives for the falsification and exaggeration of testimony threaten the very integrity of the judicial process which depends upon the truthfulness of witnesses."). *See also Cosgrove v. Sears Roebuck & Co.*, 81 CIV. 3482 (CSH), 1987 WL 33595 (S.D.N.Y. Dec. 21, 1987) (precluding testimony from contingency-fee expert); *Crowe v. Bolduc*, 334 F.3d 124, 132 (1st Cir. 2003) ("an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy. That rule was adopted precisely to avoid even potential bias."); *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 73 (2d Cir. 1990) (excluding

an expert's testimony as a result of the fact that he had been retained on a contingency-fee basis); *Farmer v. Ramsay*, 159 F. Supp.2d 873 (D. Md. 2001) (excluding an expert's report and testimony as a result of an improper contingency fee arrangement).

Moreover, in a case like the instant one, where the investigator — who, as explained below, is not even properly regulated by the state of Florida — is tracking BitTorrent users who have downloaded video files from a BitTorrent stream, the investigator's interest becomes even more suspect because the inherent bias has not only the tendency to encourage false testimony but also the potential creation of a "honeypot," or the uploading of certain video files into the BitTorrent stream with the intention of entrapping unsuspecting users into committing potential violations by downloading copyrighted material.[20] Malibu Media has based its claim for damages on the

---

[20] *See, e.g.,* Ernesto, *Copyright Troll Ran Pirate Bay Honeypot, Comcast Cable Confirms,* TORRENTFREAK Aug. 15, 2013, available at https://torrentfreak.com/copyright-troll-ran-pirate-bay-honeypot-comcast-confirms-130815/; Joe Mullin, *Pirate Bay Suggests Prenda Did Create "Honeypot" for Downloaders,* ARSTECHNICA, June 7, 2013 http://arstechnica.com/tech-policy/2013/06/pirate-bay-data-suggests-prenda-did-create-honeypot-for-downloaders/; Violeta Solonova Foreman, *Problems with Bittorrent Litigation in the U.S.: Personal Jurisdiction, Joinder, Evidentiary Issues, and Why the Dutch Have A Better System,* 13 WASH. U. GLOBAL STUD. L. REV. 127, 148 (2014) ("Indeed, trolls often upload materials on which they own a copyright to peer-to-peer networks in order to later sue those who download these works") (citations omitted)

number of infringements noted by Mr. Fieser; thus, the more videos initially seeded into the BitTorrent swarm, the greater Mr. Fieser's earning potential.

> **B.** **Malibu Media has violated Florida chapter 493 by engaging in private investigation without a license**

Next, Because IPP and Mr. Fieser are unlicensed in Florida and have secured evidence for the purpose of using in the trial of a civil case, they are in violation of Florida's private investigator requirements as found in Chapter 493, Florida Statutes. Chapter 493 requires any person conducting investigative activities regulated thereunder to be properly licensed. Fla. Stat. § 493.6118(1)(g). Among other things, Florida defines "private investigation" to mean "the investigation by a person or persons for the purpose of obtaining information with reference to . . . The business of securing evidence to be used . . . in the trial of civil . . . cases and the preparation therefor." Fla. Stat. § 493.6101(17)(g). Furthermore, "[e]mploying or contracting with any unlicensed or improperly licensed person or agency to conduct activities regulated under ...[Chapter 493], or performing any act that assists, aids, or abets a person or business entity in engaging in unlicensed activity, when the licensure status was known or could have been ascertained by

reasonable inquiry," is a violation of Chapter 493 and grounds for discipline thereunder. Fla. Stat. § 493.6118(1)(n).  Each licensed Private Investigator in Florida must "[b]e a citizen or permanent legal resident alien of the United States or have appropriate authorization issued by the United States Citizenship and Immigration Services of the United States Department of Homeland Security." Fla. Stat. § 493.6106.

Mr. Fieser resides in and has performed all his "investigation" from Germany, and IPP International UG is "a company organized under the laws of Germany" (Doc. 3-5 ¶ 4). Neither he nor IPP is licensed within the state of Florida. Because Mr. Fieser and IPP operate to secure evidence of copyright infringement to be used in the trial of this civil case, Florida law demands they be licensed under the statute. Fla. Stat. § 493.6101(17)(g).  As Mr. Fieser/IPP is conducting private investigation without proper licensing in Florida, their investigation of John Doe is in violation of Chapter 493, and Malibu Media is in violation of section 493.6118(1)(n), which makes it a violation to hire an unlicensed private investigator.

Allowing testimony of an unlicensed investigation expert is improper. *E.g.*, *Donegal Mutual Ins. Co. v. White Consolidated Indust.*, 795 N.E.2d at 134 (Ohio App. 2003).

(interpreting a similar state licensing statute and finding testimony of unlicensed fire investigation experts improper for public policy reasons).

In its defense, Malibu Media may rely on *Capitol Records Inc. v. Thomas-Rasset,* 680 F.Supp.2d 1045, 1058 (D. Minn. 2010), which it relied upon in other cases, including *Malibu Media, LLC v. Weiheong Koh*, 13-10515, 2013 WL 5853480 (E.D. Mich. 2013), which found the argument flawed, explaining:

> [t]he holding in *Capitol Record* does not govern this case. In that case, the court found that the Minnesota Private Detectives Act did not apply to the plaintiff's investigator. In this case, Defendant raises a different law, and Plaintiff's investigator is not the same as the investigator in *Capitol Record.* Therefore, the fact that the Minnesota law did not apply to that plaintiff's investigator has no bearing on whether the . . . [Florida investigator requirements] appl[y] to IPP.

*Id*. (internal citation omitted); *see also Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014) (agreeing with *Malibu Media, LLC v. Weiheong Koh*). Here, also, *Capital Records* is inapplicable, as Minnesota law does not apply to this case in Florida; furthermore, a different unlicensed investigator is involved. Therefore, *Capitol Records* should not govern the facts of this case.

Malibu Media may also argue that, because Mr. Fieser worked out of Germany, Florida statute does not apply. However, Chapter 493 applies because the investigation was on a modem located within Florida. *See, e.g.,* *France v. France*, 90 So. 3d 860, 864 (Fla. 5th DCA 2012) (citing *Koch v. Kimball,* 710 So. 2d 5 (Fla. 2d DCA 1998)) (finding a nonresident defendant subject to Florida's Security of Communications Act, Chapter 934, Florida Statutes). In granting personal jurisdiction over a nonresident defendant who had recorded a call made with a Florida resident, the Court in *France* approved *Koch*, which had held that a tortious act occurred in Florida because an interception had occurred where the communication was uttered, and that a nonresident defendant, having recorded the conversation from another state, was subject to personal jurisdiction in Florida and section 934.03, Florida Statutes. As the defendant in *Koch* was located in another state; here, Mr. Fieser is located in Germany. Similarly, as in *Koch*, where the transmitted communication originated in Florida, here, the transmitted information Mr. Fieser investigated was allegedly sent from or to a modem in Florida. In essence, if Defendant transmitted any data from a modem in Florida, the communication would be "uttered" from Florida. The investigation of a modem within

Florida is therefore an act in Florida, and the investigator would be subject to Florida's licensing requirements.

Since 2012, Malibu Media has been filing these cases and has consistently continued to use Mr. Fieser, therefore consistently violating Florida Statute. Rather than find a proper, Florida-licensed investigator to conduct its investigations, it continues to utilize an unlicensed individual in Germany. Such continued violation of Chapter 493 calls into question the integrity of Malibu Media's only witness — and the entire basis behind this lawsuit.

### C. <u>Mr. Fieser's interception of the electronic communications at issue was unlawful</u>

Next, an examination of Mr. Fieser's actions in relation to Florida's Security of Communications Act ("FSCA"), Chapter 934 Florida Statutes, and the Federal Wiretap Act ("FWA"), brings the admissibility of such testimony into further question. The FSCA basically mirrors the language of the FWA. Both acts prohibit the intentional interception, or the procurement of another person to intercept, any electronic communication. 18 U.S.C. § 2511; Fla. Stat. § 934.03. Moreover, sending or carrying any electronic, mechanical, or other device, for the purpose of the illegal interception of wire, oral, or electronic communications, is

prohibited. 18 U.S.C. § 2512; Fla. Stat. § 934.04.   Any communication or evidence obtained in violation of FWA or FSCA *cannot be received* in evidence in any trial, hearing, or other proceeding in or before any court. *Id.; see O'Brien v. O'Brien*, 899 So.2d 1133 (Fla. 5th DCA 2005), *rehearing denied* (finding a wife's illegal interception of her husband's electronic communications with another woman grounds for excluding such communications in divorce proceedings).

Once a movie is available on a BitTorrent server, anyone with a modem and computer can download it.   What is not available to the public is the IP address of the user who made the movie available and the download history related to the IP address.   This data is communicated between the BitTorrent server and the BitTorrent user in a private communication.   A BitTorrent user remains anonymous because his IP Address is hidden in a private communication with the BitTorrent server.   In this case, Plaintiff hired IPP/Mr. Fieser, who worked as, essentially, a hacker: an unlicensed investigator out of Germany retained to hack into the BitTorrent server and surreptitiously access private communications between BitTorrent users and the BitTorrent server, including the users' IP Addresses, download history, including downloads

unlicensed to the Plaintiff[21], and other data. Because Mr. Fieser is intentionally intercepting this information, it is likely that this interception is a FWA and FSCA violation and consequently unusable as evidence in any civil action.

Plaintiff may, in defense, cite to 18 U.S.C. § 2511(g)(i) or Fla. Stat. § 934.03(h)(1), which state that it is not unlawful to intercept or access an electronic communication made through an electronic communication system configured so that such electronic communication is readily accessible to the general public. However, this section is irrelevant because Defendant does not contend that any interception of a readily accessible *movie* on a BitTorrent stream is a FWA or FSCA violation; rather, IPP's specially designed and proprietary software, which obtains the IP addresses of everyone in the stream, as well as detailed download history and other data, is obtaining information sent outside the access of the general public. If Plaintiff argues that this data was publicly available, such statement directly contradicts the hiring, by Malibu Media, of a special techie in Germany with allegedly unique and proprietary software to obtain the data. If such

---

[21] According to Mr. Fieser, his software "logged Defendant's IP address being used to distribute party files through BitTorrent," which Mr. Fieser has identified and calculated to being 515 files between February 28, 2013, and February 27, 2014.

information were truly available to the general public, Malibu Media could have obtained the data itself or, at the least, from a properly licensed investigator located closer to the forum court.  Instead, to decode private communications and data between, allegedly, a user of Defendant's Internet account, and a BitTorrent site, Malibu Media hired unlicensed, contingent-fee "investigators" IPP International/Mr. Fieser, whose own allegedly proprietary "International IPTRACKER" software hacks into the BitTorrent server from a remote location in Germany to obtain data relating to the IP address and detailed download history, which also include works to which Plaintiff has no rights.  Such actions are prohibited under FWA and FSCA as intentional interceptions electronic communication.  Therefore, any evidence obtained therefrom is prohibited from being introduced into a civil case.

Plaintiff may also argue that state law does not apply to it because Mr. Fieser worked out of Germany, not in Florida.  However, as explained above, a nonresident defendant is subject to Florida law.  *E.g.*, *France*, 90 So. 3d at 864 (*citing Koch,* 710 So.2d at 5).  As interception of the communication would be a tortious act in Florida, Mr. Fieser's German location is irrelevant to this analysis. Furthermore, even if the court finds that Malibu Media is not subject to

Florida's Security of Communications Act, Malibu Media would be subject to the federal Wiretap Act. Congress has plenary power under the Commerce Clause, U.S. Const. art. 1, § 8, cl. 3, to prohibit all interception of wire communications forming part of interstate or foreign communications network, whether by wiretapping or otherwise. As such, Plaintiff, IPP, and Mr. Fieser are subject to the Federal Wiretap Act. *See United States v. Blattel*, 340 F. Supp. 1140, 1142 (N.D. Iowa 1972).

Finally, Plaintiff may argue that FSCA does not apply to the transmission of data over the Internet; however, such a claim would be wrong. *See, e.g.*, *In re Google Inc.*, 13-MD-02430-LHK, 2013 WL 5423918 (N.D. Cal. 2013) *motion to certify appeal denied*, 5:13-MD-2430-LHK, 2014 WL 294441 (N.D. Cal. 2014) (finding Google's alleged interception of email content and affiliated data was not exempt from FWA and FSCA). Here also, information is being sent over the Internet, as it was in *Google*, and intercepted, as was alleged in *Google.* As a result, the FWA and FSCA would be applicable to such illegal interception. Therefore, any evidence Plaintiff has obtained in violation of the FWA and FSCA would be inadmissible.

IV. <u>**The Court should take note of GuardeLay/IPP's Maintenance and Champerty in these Copyright Cases**</u>

Finally, Plaintiff's lucrative field of copyright

infringement litigation appears to be grounded in maintenance and champerty. Champerty requires a party unrelated to the lawsuit to form an agreement with a litigant in the suit to help pursue the litigant's claim in consideration for receiving part of the judgment. *Law Office of David J. Stern, P.A. v. Sec. Nat'l Servicing Corp.*, 969 So. 2d 962, 975 (Fla. 2007) (*citing* Black's Law Dictionary 246 (8th ed. 2004)). "Maintenance is an officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise, to prosecute or defend it." *Kraft v. Mason*, 668 So. 2d 679, 681 (Fla. 4th DCA 1996) (citation omitted). "Under the modern view, it is the act of one improperly, and for the purpose of stirring up litigation and strife, encouraging others either to bring an action or to defend a suit which they have no right to make." *Id*.

The business model behind the instant litigation appears to have originated with Guardaley, a forensic investigation firm in Karlsruhe, Germany. *E.g.*, Exh. 8,9 (Exh. "E" and "F" to the Pietz Declaration) (2008 email from Guardaley managing partner soliciting a law firm to partner with him to spawn large-scale litigation). Guardaley had a good run at these sweeping lawsuits, until a German court found their IP tracking

software was not 100% accurate. *E.g.* Exh. 9 at 6.

It has become increasingly evident that IPP is merely a shell company for Guardaley. *E.g.*, Exh. 9 at 5. Guardaley essentially disappeared from the pornography copyright infringement cases after the devastating German court ruling. Thereafter, IPP, which is also based out of Karlsruhe, appeared to pick up where Guardaley left off. Interestingly, the trail Guardaley has left that links it to IPP. *See* Exh. 23 ("T") (showing an email address for an employment position at IPP was [jobs@guardalay.com](jobs@guardalay.com)).

Finally, a recently leaked Guardaley "Anti-Piracy Management Company" sales and operations manual is cause for alarm[22] and demonstrates how these "forensic experts" are undermining our legal system. Guardaley, as evidenced in its manual, presents itself via multiple shells as a mere "forensic expert." Upon information and belief, Guardaley/IPP is in fact a very well-organized business monetizing illegal file-sharing: It recruits attorneys and plaintiffs, and actually steers the industrial-scale litigation campaign.

---

[22] Devil's Cookbook: Guardaley's Presentation (Apr 21, 2014) at http://fightcopyrighttrolls.com/2014/04/21/devils-cookbook-guardaleys-presentation/

**V.**    **Conclusion**

Malibu Media's case is a house of cards, and collapse is imminent.  First, as an IP address is not a person, this Court should follow the trend set in this judicial division by the likes of Judges Ungaro and Moreno in similar or near-identical cases and dismiss the action.  Second, as Plaintiff's only evidence was obtained unlawfully by an unlicensed investigator and pursuant to a contingent witness-fee agreement, all references to and reliance on IPP or Mr. Fieser's testimony should be stricken, pursuant to Rule 12(f) as being immaterial, impertinent, or scandalous.  With these allegations removed, Malibu Media has not one shred of a factual allegation against John Doe — and therefore no case. Therefore, a dismissal is proper pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

WHEREFORE, for the foregoing reasons, Defendant, JOSE BENITEZ, respectfully requests that this Honorable Court enter an Order:

1.    GRANTING this Motion;

2.    STRIKING all references to or reliance on Mr. Fieser's/IPP International's data;

3.    DISMISSING the instant case; and

4.    Any other relief as is just and proper.

## **CERTIFICATE OF GOOD-FAITH CONFERENCE**

I hereby certify that, on June 4, 2014, I conferred, telephonically, with counsel for Plaintiff, who stated that Plaintiff is opposed to the relief requested in this motion.

/s/ Cynthia Conlin, Esq.
CYNTHIA CONLIN, ESQ.
Florida Bar No. 47012
cynthia@cynthiaconlin.com

## **CERTIFICATE OF SERVICE**

I hereby certify that I filed electronically the foregoing with the Clerk of the Court via CM/ECF system which will notify electronically all parties.

*Attorney for John Doe:*

**Cynthia Conlin, P.A.**
1643 Hillcrest Street
Orlando, Florida 32803-4809
Tel 407-965-5519
Fax 407-545-4397
www.cynthiaconlin.com

/s/ Cynthia Conlin, Esq.
CYNTHIA CONLIN, ESQ.
Florida Bar No. 47012
cynthia@cynthiaconlin.com