**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Case No. 8:13-cv-03007-JSM-TBM |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERTO ROLDAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS ACTION WITH MOTION TO STRIKE INADMISSIBLE EVIDENCE FROM COMPLAINT WITH INCORPORATED MEMORANDUM OF LAW**

i

## I.     INTRODUCTION

Defendant's Motion to Dismiss Action with Motion to Strike Inadmissible Evidence From Complaint (CM/ECF 14) ("the Motion") should be denied.  Defendant has failed to articulate any reason under Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(f) to dismiss the Complaint or strike Plaintiff's investigator's declaration.  While Defendant correctly asserts that Malibu Media, LLC ("Malibu") paid IPP International UG ("IPP"), who is not licensed by the State of Florida as an investigator, for its data collection services, Defendant erroneously argues that the physical evidence obtained by IPP is inadmissible and therefore this Court should quash the subpoena, vacate its previous order, and dismiss the case.  Neither paying a service provider to record computer data nor the failure of a service provider to have a license is a basis under the Federal Rules of Evidence to exclude relevant evidence or for any of the relief Defendant requests.  Further, this Court should not dismiss the case because Plaintiff pled a plausible claim that Defendant is the infringer.  For all the foregoing reasons, as more fully explained below, Defendant's Motion should be denied.

## II.    FACTUAL BACKGROUND

### A.   Online Copyright Infringement Through the BitTorrent Protocol is a Serious and Significant Threat to Plaintiff's Business

Colette Pelissier Field, with her husband Brigham Field, are the owners of Malibu Media and began their business from scratch.  *See* CM/ECF 4-2 at ¶3.  The Fields both felt that there was a lack of adult content that was beautiful and acceptable for women and couples.  *Id*. at ¶ 6.  The Fields wanted to create this type of content to satisfy what they hoped was an unfulfilled demand.  *Id*.   Their goal was to create erotica that is artistic and beautiful.  *Id*. at ¶ 7.  The Fields chose the name 'X-Art' to reflect their artistic aspirations, and began investing all of their available money and resources into the production of content – particularly erotic movies with

1

high production value and a cinematic quality. *Id.* at ¶ 8.

Popular men's magazine GQ did a feature on X-Art.[1]  GQ did not hesitate to qualify X-Art's success as a company.  "Investing in next-level cinematography - with a mantra to eschew porn tropes - the mom-and-pop American start-up has grown into a global production team, accessed by viewers in the hundreds of millions." *Id.*  Indeed, the GQ article aptly describes the talent of the Fields, the emotional intelligence behind the X-Art videos, and the fact that the crew works incredibly hard, filming throughout the world with the most talented directors, to present the best videos possible.

Currently, X-Art.com has tens of thousands of members, but the Fields are finding it hard to grow and maintain the memberships when so many people are finding their films for free. *Id.* at ¶ 15.  They have worked hard and invested millions of dollars into their business in order to produce the best quality product. *Id.* at ¶ 14.  For the first three years (when their site was not as popular) they did not have as many issues with piracy. *Id.* at ¶ 18.  Now that their videos are highly desirable, more people steal their videos than pay for a subscription. *Id.*  Malibu Media receives many complaints from its members asking why they should pay to subscribe when Malibu Media's movies are available for free through BitTorrent. *Id.* at ¶ 19.  Malibu Media invests significant resources into pursuing all types of anti-piracy enforcement, such as Digital Millenium Copyright Act ("DMCA") takedown notices and direct efforts aimed at infringing websites. *Id.* at ¶ 27.  Despite sending thousands of DMCA notices per week, the infringement continues. *Id.* at ¶ 28.   And, if one searches for "X-Art" on a torrent website the site will reveal thousands of unauthorized torrents available for free. *Id.*  Plaintiff Malibu Media has filed suit in this judicial District and in judicial districts across the country seeking to deter and stop the infringement.

---

[1] http://www.gq-magazine.co.uk/girls/articles/2013-03/13/brigham-colette-field-x-art-sex-scene (Exhibit B)

Defendant's criticism of Plaintiff's copyright protection efforts is unjustified. Defendant incorrectly implies that Malibu Media was formed just to file lawsuits when the company had been functioning for over a year prior to doing so. As set forth above, the main overwhelming source of the company's income is from its subscribers. Malibu targets the absolute worst infringers of its movies. It cannot target individual seeders because almost always those initial seeders are located in jurisdictions outside the United States. "Many internet blogs commenting on [these types of cases] ignore the rights of copyright owners to sue for infringement, and inappropriately belittle efforts of copyright owners to seek injunctions and damages." *Malibu Media, LLC v. John Does 1, 6, 13, 14 and Bryan White*, 2013 WL 3038025 at n.1 (E.D. Pa. June 18, 2013). Last June, Plaintiff won the first ever BitTorrent copyright infringement lawsuit to reach trial. *See Id*. In his Memorandum Report after the conclusion of the trial, the Honorable Judge Baylson made a number of significant findings. Importantly, Judge Baylson found "Malibu Media Malibu has satisfied its burden of proof with substantial evidence and deserves a large award.*" Malibu Media, LLC v. John Does 1, 6, 13, 14*, CIV.A. 12-2078, 2013 WL 3038025 (E.D. Pa. June 18, 2013).

B. The Infringer

Defendant's parent's Internet was used to infringe forty (40) of Plaintiff's copyrighted works over the course of several months. *See* CM/ECF 1-2. By downloading each of these movies through the BitTorrent protocol, Defendant simultaneously distributes these movies to others, allowing other people to also steal Plaintiff's movies. *See* Complaint, at ¶¶ 11 -20.

As set forth in Plaintiff's Amended Complaint, Plaintiff knows Defendant is the infringer because Plaintiff's additional evidence of BitTorrent use corresponds with interests on Defendant's Facebook. In fact seven TV shows, two music groups, and one movie match his

3

"likes" on Facebook.  Defendant claims this is a coincidence and that many people like the same TV, music, and movies as Defendant.  While it may be true that Defendant likes popular entertainment, the infringement was traced to Defendant's father's home.  Defendant has suggested no individual other than himself that had access to the Internet connected to the infringing IP address, and also liked the same combination of television, music and movies as the infringer.

C.  Malibu and IPP Have a Written Fixed Fee Agreement

Malibu and IPP have a written fixed fee agreement pursuant to which Malibu pays IPP for providing the service of collecting data about infringements.  Exhibit A, Field, at ¶ 8.  IPP has not been paid anything for this case.  Exhibit B, Fieser, at ¶ 10.  Malibu's prior oral agreement with IPP to pay IPP a small portion of the amount received from a settlement or judgment from Malibu's litigation does not apply to this case.  Field, at ¶ 7.  Malibu has never paid *any* fact witness to testify in this case or any other case.  *Id.*, at ¶ 9.  Here, in preparation of its response to this motion, Plaintiff asked Michael Patzer, an individual who does not work for IPP, but who instead created the software IPP uses to record Defendant's infringement, to examine the evidence.  *See* Exhibit C.  Mr. Patzer independently reviewed the evidence in this case and confirmed that the software recorded Defendant's IP address infringing Plaintiff's copyrighted works at the exact Hit Dates and UTC times listed on Exhibit A to Plaintiff's Complaint.  Patzer, at ¶ 13.

D.  Judge Baylson Found the Data Collection System Was Valid

Judge Baylson presided over the Bellwether trial wherein Malibu was the first ever Plaintiff to try a BitTorrent copyright infringement case.  At the trial, Judge Baylson had an independent court appointed computer expert in attendance.  After the trial, Judge Baylson found

that IPP's data collection system "is valid."  *See Malibu Media, LLC v. John Does 1, 6, 13, 14*, 950 F. Supp. 2d 779, 782 (E.D. Pa. 2013) ("Malibu [] expended considerable effort and expense to determine the IP addresses of the infringing parties, and the technology employed by its consultants . . . was valid.")  Defendant has the right to hire an expert to test the data collection system.  Defendant has chosen instead to attack the data collection system based upon unfounded speculation about the potential for biased testimony in the hopes that Plaintiff will never know Defendant's identity and he will never be held liable for his infringement.  Defendant's attack does not specify how the system may be flawed or how testimony that merely reads computer records can be biased.  This is no surprise because there is no possibility for biased testimony.

## III.   <u>ARGUMENT</u>

### A.   <u>This Court Should Not Dismiss the Complaint</u>

When analyzing a Rule 12(b)(6) motion to dismiss, "the Court accepts the factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff."  *Speaker v. U.S. Dept. of Health & Human Services Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).  However, allegations pled as legal conclusions are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009).  The complaint must present "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   And, it must "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."   *Id.*

Defendant asks the Court dismiss Plaintiff's Complaint on the basis of recent orders from the Southern District of Florida.  This Court should not do so because those orders failed to consider that Plaintiff's Complaint pled that Defendant, the subscriber of the IP address used to infringe its movies, is the infringer and that allegation is plausible under Supreme Court precedent.

Defendant relies on the Honorable Judge Ungaro's previous ruling, which held "Plaintiff has not shown how this geolocation software can establish the identity of the Defendant. There is nothing that links the IP address location to the identity of the person actually downloading and viewing Plaintiff's videos, and establishing whether that person lives in this district." *See Malibu Media v. John Doe*, 1:14-cv-20213-UU (S.D. Fla. March 20, 2014) ("Malibu Media Ruling").

> Even if this IP address is located within a residence, the geolocation software cannot identify who has access to that residence's computer and who would actually be using it to infringe Plaintiff's copyright. The Court finds that Plaintiff has not established good cause for the Court to reasonably rely on Plaintiff's usage of geolocation to establish the identity of the Defendant. The Court also finds that Plaintiff has not established good cause as to why this action should not be dismissed for improper venue.

*Id*. Judge Ungaro then dismissed Plaintiff's case on the basis of <u>failing to establish proper venue</u> and because geolocation software cannot identify the infringer.

Judge Ungaro's holding cannot possibly be applied to this case to assert improper venue because venue is proper. 28 U.S.C. §1400, the statute dictating venue in copyright cases states: "**(a)** Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found." *Id*. Here, Brighthouse, Defendant's Internet Service Provider, identified Defendant as residing in Seffner, FL, a town located within the Middle District of Florida. Plaintiff sued Mr. Benitez and therefore he is the Defendant. Defendant has not contested that he resides elsewhere. That there is some possibility that another individual committed the infringement does not make venue in this case improper.

Further, geolocation technology is not being used to identify the Defendant; Brighthouse's business records identified Defendant. The statement "[t]here is nothing that links the IP address location to the identity of the person actually downloading and viewing Plaintiff's videos, and establishing whether that person lives in this district" is simply not true. Plaintiff pled that the person actually downloading and viewing Plaintiff's movies is the subscriber and owner of the IP address.

6

This allegation is not only plausible it is true the vast majority of these cases.  Indeed, Plaintiff proved it to be true in the Bellwether trial and has had numerous subscribers admit to committing the infringement, some of whom have even filed public allocutions.  Here, the infringement occurred for several months.  It was not a guest, or mere passerby, or someone standing on the street.  It was someone who consistently accessed Defendant's Internet on a regular basis.  Given that Defendant is the only person who pays to use the Internet, it is not only plausible but highly likely he is the infringer.

Every Court in the country to rule on a 12(b)(6) motion regarding Plaintiff's Complaint has found that its allegations are plausible.[2]  "Plaintiff's allegation that its investigator connected to a computer associated with Defendant's internet account and was able to download bits of Plaintiff's copyrighted movies from it <u>supports a plausible claim</u> that Defendant infringed on Plaintiff's copyrighted works by copying and distributing portions of its movies." *Malibu Media LLC v. Gilvin*, 3:13-CV-72 JV, 2014 WL 1260110 (N.D. Ind. Mar. 26, 2014) (emphasis added).

Respectfully, the cases relied upon by Defendant erred by finding that venue was not established because the Defendant may not be the infringer.  These cases ignore that Plaintiff does not need to prove at this stage that Defendant is the infringer and Plaintiff properly established venue over the Defendant.  "[Defendant] seems to argue that Malibu Media must, at this stage, put forth actual proof that [Defendant] has a BitTorrent Client on his computer or he

---

[2] *Malibu Media, LLC v. Pelizzo*, 2012 WL 6680387 at *1 (S.D. Fla. 2012) ("Having carefully reviewed the allegations in the Complaint and the applicable authorities, the Court will deny the Motion because the Complaint adequately states a claim for copyright infringement."); *Malibu Media v. Roy*, Case No. 12-cv-617 (W.D. Mich.) (denying 12(b)(6) motion); *Malibu Media v. Pratt*, 1:12-cv-00621-RJJ, CM/ECF 31 (W.D. Mich. March 19, 2013) (same); *Malibu Media, LLC v. John Doe*, 2:13-cv-11446-AJT-DRG, CM/ECF 13 (E.D. Mich. Oct. 18, 2013) (same); *Malibu Media, LLC v. Lowry*, 2013 WL 6024371, at *5 (D. Colo. 2013); *Malibu Media, LLC v. John Doe 1*, 2013 WL 30648 at *4 (E.D. Pa. 2013) (same); *Malibu Media, LLC v. Killoran*, 2:13-cv-11446-AJT-DRG, CM/ECF 13 (E.D. Mich. Oct. 18, 2013) (same); *Malibu Media, LLC v. John Doe*, 2:13-cv-00055-JVB-JEM, CM/ECF 22 (N.D. Ind. August, 16, 2013); *Malibu Media LLC v. Doe*, 2013 WL 3945978 (E.D. Mich. 2013) (same); *Malibu Media LLC v. Gilvin*, 2014 WL 1260110 (N.D. Ind. Mar. 26, 2014) (same); *Malibu Media, LLC v. Sanchez*, 2014 WL 172301 (E.D. Mich. Jan. 15, 2014) (same); *Malibu Media, LLC v. Butler*, 13-cv-02707-WYD-MEH, CM/ECF 31 (D. Colo. April 24, 2014).

copied the Work. [Defendant] demands too much too soon; proof is not required to properly plead a claim for copyright infringement." *Malibu Media, LLC v. Harris*, 2013 WL 3780571 (S.D. Ind. 2013).

Toward that end, the Eastern District of Pennsylvania specifically rejected the Honorable Judge Ungaro's holding. "The arguments that John Doe raises concerning the link between the actual infringer and the IP address or MAC address do not undermine the plausibility of Malibu Media's claim or defeat that claim as a matter of law -- rather, John Doe raises factual issues about identity more properly dealt with during discovery." *Malibu Media v. John Doe*, 2:14-cv-01280-SD (E. D. Pa. May 19, 2014) (attached as Exhibit D). The Court then found that Malibu Media had made a *prima facie* showing of venue by using geolocation technology. "[A] defendant 'may be found' wherever he is amenable to personal jurisdiction,' and Malibu Media has made a prima facie showing of personal jurisdiction by alleging its geolocation software places the defendant within this district." *Id.* (internal citations omitted).

### B.    Malibu is Permitted to Pay For Data Collection Services

Malibu has not paid nor offered to pay any individual for testimony. The fee Malibu pays IPP is for data collection services. Paying IPP for data collection services is neither unethical nor prohibited by law. "[T]his Court is unaware of any authority that interprets Rule 4-3.4(b) as barring counsel from compensating someone for their efforts in collecting evidence." *Platypus Wear, Inc. v. Horizonte Fabricacao Distribuicao Importacao Exportacao Ltda*, 2010 WL 625356 (S.D. Fla. 2010). "[P]arties are free to pay individuals, including fact witnesses, for providing information and assisting with litigation, so long as the payment is not for their testimony." *Armenian Assembly of Am., Inc. v. Cafesjian*, 924 F. Supp. 2d 183, 194 (D.D.C. 2013). "Anyone has a right, when threatened with litigation, or desiring himself to sue, to employ assistance with a view of ascertaining facts as they exist, and to hunt up and procure the

presence of witnesses who know of facts and will testify to them." *Hare v. McGue*, 178 Cal. 740, 742, 174 P. 663, 664 (1918). At significant expense, IPP provides Malibu with labor and a data collection service. Malibu Media is permitted to pay IPP for its service.

      C.     <u>The Northern District of Illinois and the Southern District of Indiana Recently Denied Motions Nearly Identical to Movant's Motion in Malibu Media Cases</u>

Defendant's incorrect claim that Plaintiff pays Mr. Feiser on a contingency is based on a declaration by an attorney who has never taken discovery on the issue. In fact, both Defendant and Mr. Pietz only learned of the issue when Plaintiff's discovery responses were posted on the Internet. Defendant's motion relies on two discovery responses in a Northern District of Illinois case and a Southern District of Indiana case. *See* Def's Mot at *10 citing to Malibu Media v. John Doe, 13-cv-6312 (N.D. Ill.) and *Malibu Media v. Hinds*, 1:12-cv-1117-WTL-DML, (actual caption is *Malibu Media v. Harrison*, 1:12-cv-01117-WTL-MJD). Defendant disingenuously fails to inform this Court, however, that both the Northern District of Illinois and the Southern District of Indiana have ruled on the *<u>identical issue</u>* raised here, regarding these exact discovery responses, and found Plaintiff's conduct proper.

This issue of whether Plaintiff pays its investigator on a contingency was officially first raised by an opposing counsel in *Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014). In that case, the Court found that Malibu Media's agreement with IPP was not a reason to quash the subpoena. "The Court is not convinced that the fact that Malibu Media pays IPP for its services would have changed the decision to grant the subpoena. Thus, Malibu Media's failure to apprise the Court of this fact does not warrant quashing the subpoena." *Malibu Media, LLC v. Doe*, 13 C 8484, 2014 WL 1228383 (N.D. Ill. Mar. 24, 2014).

Defendant copied the arguments made by opposing counsel in the case above.

Doe's other three arguments relate to what Doe considers to be illegality and obfuscation surrounding Malibu Media's investigative methods. Doe maintains

> that because of these problems, the Court should not have considered Fieser's declaration.

*Id*. Plaintiff's response in that case was similar to the response here:

> In response to Doe's motion, Malibu Media provides declarations that IPP is paid only for data collection services, that IPP has not been compensated for any work related to this specific case, and that Malibu Media has never paid nor offered to pay Fieser anything for his testimony.

*Id*. Considering all the arguments, the Court found that <u>even if</u> IPP had been paid in violation of the rules (which they have not), that violation does not warrant dismissal or quashing the subpoena.

> But even if Fieser or IPP were compensated on a contingency basis or otherwise for testimony, in violation of the rules of professional conduct applicable in this Court or 18 U.S.C. § 201(c)(2), which prohibits paying fact witnesses for their testimony, this does not make evidence obtained in violation of those rules inadmissible but rather only goes to the weight to be accorded to it.

*Id*.

Despite the ruling above, defense counsel have continued to copy this argument. In the Southern District of Indiana, the Honorable Judge Dinsmore denied a Motion for an Order to Show Cause as to why Plaintiff should not be sanctioned which also raised this issue. Judge Dinsmore was the presiding judge in *Malibu Media v. Harrison*, 1:12-cv-01117-WTL-MJD where the discovery responses relied on by Defendant were submitted and therefore has firsthand knowledge of the issue. In doing so, Judge Dinsmore found that Plaintiff did not engage in improper conduct when it paid IPP for its data collection services. *See Malibu Media, LLC v. Kelley Tashiro*, 1:13--cv--00205--WTL--MJD (S.D. In., Sept. 25, 2013). "Defendant has not offered any evidence that Plaintiff is paying IPP for anything but data collection services used to gather information on Defendant to demonstrate infringement." *Id*. "Based upon this response to an interrogatory, Defendant has made the inference that the contingent fee arrangement is for the testimony IPP will give and not for any other purpose. The Court is not convinced that such an

inference is justified. As Plaintiff explained in its response brief, *the fee paid to IPP is for the collection of data and not for IPP to testify as a witness.*"  *Id.* at \*2 (emphasis added).

      D.    <u>No Witness Has Ever Been Paid For Testimony Much Less on a Contingent Basis</u>

Defendant erroneously conflates Malibu's proper payment to IPP for its data collection services with the false allegation that Malibu paid Tobias Fieser for testimony.  Mr. Fieser is a salaried non-equity owning employee of IPP.  Fieser, at ¶¶ 4, 7.  Malibu has never paid nor offered to pay Mr. Fieser anything. *Id.*, at ¶ 11.  When, as here, "[i]t is clear that the [individual] himself, as a witness, is not eligible to receive compensation for his testimony . . . [the] case does not even involve the payment of a fee to a witness." *People v. McNeill,* 316 Ill. App. 3d 304, 306, 736 N.E.2d 703, 705 (Ill. App. Ct. 2000).  In *McNeil,* the witness's employer's compensation was contingent on the outcome of the case.  Like here, however, the witness was not paid for his testimony.  The *McNeil* Court refused to exclude the witness and opined that the defendant could always attempt to impeach the witness's credibility on the basis that his employer had a contingent interest in the case.

      E.    <u>Even if Malibu Had Paid a Witness on a Contingency That Witness's Testimony Should Not be Excluded</u>

"The *per se* exclusion of whole categories of evidence is disfavored by the Federal Rules of Evidence.  It is a fundamental tenet of those rules that, with few exceptions, 'all relevant evidence is admissible,' Fed. R. Evid. 402, and 'every person is competent to be a witness,' Fed. R. Evid. 601." *U.S. v. Cervantes-Pacheco*, 826 F.2d 310, 315 (5th Cir. 1987) (refusing to prevent the federal government's confidential informant from testifying even though the federal government had offered the confidential informant *contingent* compensation for his testimony.) "Merely because [Witness] was a paid informer does not render his testimony inadmissible." *United States v. Valle-Ferrer*, 739 F.2d 545, 547 (11th Cir. 1984); *see also United States v.*

11

*Wilson*, 904 F.2d 656, 659 (11th Cir. 1990) (allowing testimony when witnesses were paid on a contingency).  Notably absent from Fed. R. Evid. 402 and 601 is that a witness be disinterested or uncompensated in order to be permitted to testify.

      F.    <u>Malibu Media Does Not Seed Its Videos</u>

      Defendant alleges, based upon nothing but false speculation, that Plaintiff's investigator, IPP, engages in what is referred to as a "Honeypot."  Simply put, this is when a copyright owner seeds (uploads) copies of their own works on BitTorrent in order to create potential claims upon which to sue.  Malibu Media is absolutely certain that no party or entity associated with it is uploading their Works to BitTorrent.  To allege that just because another entirely unrelated copyright holder at one point seeded movies onto BitTorrent, Plaintiff must do so as well, as Defendant has done here, is nothing short of bad faith.

      Like all of Defendant's arguments, this argument here is nothing more than recycled speculation proffered by defense counsel in an attempt to discredit Plaintiff.  In the Northern District of Illinois, Plaintiff's counsel prepared a report in which it provided an objective analysis demonstrating the absurdity of this argument.  *See Malibu Media v. John Doe*, 1:14-cv-00693 (N. D. Il. April 4, 2014) (CM/ECF 13).  In that report, Plaintiff showed that 2,625 individual pirated copies of various Malibu Media movies were the subject of cases in the Northern District of Illinois alone.[3]  (Exhibit E).  That Malibu Media would upload those thousands of pirated versions of their Works on BitTorrent while simultaneously incurring the time and expense to employ individuals whose sole responsibility is to issue take down notices requesting over 360,000 infringing URLs be removed via DMCA takedown notices is nonsensical.  *See* Exhibit F.   More importantly, Malibu Media's main source of revenue is from the subscribers of its

---

[3] Should the Court desire Plaintiff to do so, Plaintiff will submit a similar report for the Middle District of Florida.

website, not from lawsuits.  Intentionally seeding its movies would only cause Malibu to incur more damage to its business and would hurt itself.

G.  <u>IPP is Not Subject to the Licensing Requirements of Florida Statutes Chapter 493</u>

IPP is not subject to the licensing requirements of Florida Statutes Chapter 493. "Florida's strong presumption against extraterritorial application of its law prohibits its application in this case. Florida courts have consistently declined to apply Florida law outside territorial boundaries unless a statute contains an 'express intention that its provisions are to be given extraterritorial effect.'" *Boehner v. McDermott*, 332 F. Supp. 2d 149, 155 (D.D.C. 2004) *aff'd*, 441 F.3d 1010 (D.C. Cir. 2006) and *aff'd*, 484 F.3d 573 (D.C. Cir. 2007) (*citing Burns v. Rozen*, 201 So.2d 629, 630 (Fla. 1st DCA 1967); and *Southeastern Fisheries Ass'n, Inc. v. Dep't of Natural Res.*, 453 So.2d 1351, 1355 (Fla.1984)). IPP is a company organized and existing under the laws of Germany. Fieser, at ¶ 5. It is not a Florida entity. It does not operate in Florida. It has no employees or agents in Florida. It conducts no business in Florida. It pays no taxes in Florida. Defendant failed to submit a valid argument or any authority in support of the applicability of the Florida statute to this case.

Here, Defendant sent pieces of Malibu's copyrighted movies to Germany where the infringement was recorded. Indeed, Defendant correctly notes that "Mr. Fieser resides in and has performed all his 'investigation' from Germany[.]" Motion, p. 15. As such, Defendant admits that Plaintiff's investigator took no action whatsoever in the State of Florida. And, Defendant's IP address was not geolocated to a place within this district until *after* the infringement occurred. Accordingly, at the time the infringement occurred and was logged there was no way of knowing where Defendant resided.

Plaintiff's investigator's software only received information that was already <u>publicly</u> available to the thousands of users on the BitTorrent system.  Indeed, a computer utilizing Defendant's IP address willfully connected to the investigator's server and offered the information.  "There is no expectation of solitude or seclusion when a person activates a file sharing program and sends a file to the requesting computer . . . a user expects millions of other users to view and copy her files, each time receiving the very information that [Defendant] sent to [the investigator] and . . . recorded."  *Capitol Records, Inc. v. Thomas-Rasset*, 2009 WL 1664468, at *4 (D. Minn. 2009).  Although not binding on this Court, the *Capitol Records* court held that the Minnesota Private Detectives Act had no application because the plaintiff's investigator was located outside of the state, had no employees within the state, conducted no activities within the state, paid no taxes within the state, and had no agent within the state.  "Merely monitoring incoming internet traffic sent from a computer in another state is insufficient . . . ."  *Id.  See also Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 257 (D. Me. 2008) (peer-to-peer file sharing case denying argument that because plaintiff's investigator was not licensed in Maine, the court should not have relied on the information it gathered in issuing expedited discovery order.)  Similarly here IPP merely monitored incoming internet traffic sent from a computer in another state and doing so is insufficient to constitute a violation of Florida's private investigator licensure laws. In this case, Defendant connected to Plaintiff's server and directly transmitted to Plaintiff pieces of Plaintiff's movies.  Plaintiff's investigator simply recorded those voluntary transmissions.

Defendant attempts to argue that "if Defendant's modem is in Florida, the communication was 'uttered' from Florida, because the information originates from the Florida location."  Motion, pp. 16-17.  Defendant therefore concludes that "[t]he investigation of a

modem within Florida is therefore an act in Florida, and the investigator would be subject to Florida's licensing requirements." Motion, p. 17.  Defendant relies on *France v. France*, 90 So. 3d 860, 864 (Fla. Dist. Ct. App. 2012) in support of this argument.

The *France* case does not stand for the proposition that an out-of-state investigator who received information distributed from a computer with an IP address located within Florida is required to be licensed in the State of Florida.  *France* dealt with whether or not there was personal jurisdiction over a defendant who recorded telephone calls with a Florida resident from outside of the State of Florida.  The Court concluded that personal jurisdiction was proper and also noted "for Ms. France to have committed an act that allowed for a civil remedy under section 934.10, it would seem to be necessary that her conduct in North Carolina constituted a criminal violation of section 934.03 in Florida.  We question whether Ms. France's conduct would subject her to criminal prosecution in this state." *Id.*

Finally, the determination of what constitutes a violation of Fla. Stat. 493.61118(1)(g) is left to the Department of Agriculture and Consumer Services.  *See* Fla. Stat. 493.6121(1) ("The department shall have the power to enforce the provisions of this chapter . . . and . . . to cause to be investigated any suspected violation thereof or to cause to be investigated the business and business methods of any licensed or unlicensed person . . . under this chapter.")  Federal courts have little interest in ascertaining whether a Florida state licensing statute has been violated.  Regardless, under the laws of the State of Florida, courts do not have jurisdiction or authority to ascertain whether a licensing statute has been violated.  *See also e.g. Malibu Media, LLC v. John Doe*, 1:13-cv-08484, CM/ECF 25, at p. 5 (N.D. Ill. March 24, 2014) (rejecting an identical argument under Illinois law stating, "Doe is asking the Court to determine what constitutes the

unlicensed practice of private investigation, but that is a determination left to the Illinois Department of Financial and Professional Regulation.")

H.   <u>Florida State Licenses Are Not a Prerequisite to Being a Witness</u>

Federal courts across the country universally agree that state licenses are not a prerequisite for a witness to give testimony. *See St. Cyr v. Flying J Inc.*, 2007 WL 2406999, at *5 (M.D. Fla. 2007) ("this Court will not prohibit Flying J from eliciting expert testimony from LaDon Richardson based on the single fact that he does not hold a Florida license under Florida Statute § 493.6100 *et seq.*"); *Principi v. Survivair, Inc.*, 2005 WL 5961991, at *2 (M.D. Fla. 2005) ("whether Dr. Hollis is a licensed engineer in the State of Florida . . . has no bearing on the admissibility of his testimony."); *Malbrough v. State Farm Fire & Cas. Co.*, 1996 WL 565819, at *2 (E.D. La. 1996) ("a license is not a prerequisite to expert testimony under the Federal Rules."); *Dillon Cos., Inc. v. Hussmann Corp.*, 163 Fed.Appx. 749, 756 (10th Cir. 2006) ("there is no authority that an expert . . . . is not qualified to testify because he was not licensed in the state where the trial occurred."); *McRunnel v. Batco Mfg.*, 917 F. Supp. 2d 946, 952 (D. Minn. 2013) ("The Court holds that licensing in the jurisdiction of the lawsuit is not a prerequisite for admissibility under Rule 702."); *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 112 (D.D.C. 2004) ("Courts frequently admit the testimony of experts even if the expert is not licensed to practice in the jurisdiction in which the court sits.")  As such, Plaintiff's investigator's testimony is admissible and proper.

Apparently attempting to argue that unlicensed investigators are not entitled to testify as experts, Defendant cites to *Donegal Mut. Ins. Co. v. While Consol. Indus.,* 153 Ohio App. 3d 619.  *See* Motion, pp. 15-16.  Defendant's argument rings hollow.  First, the entire paragraph at the bottom of page 15 of Defendant's Motion was taken verbatim from *Arista Records LLC v.*

*Does 1-27*, 584 F. Supp. 2d 240, 256-57 (D. Me. 2008). Defense counsel intentionally neglected to cite to the *Arista* case, however, despite taking its language because *Arista* expressly rejected *Donegal*, on which Defendant attempts to rely. "Magistrate Judge Kravchuk was interpreting the same Maine statute at issue here and the Court finds her view more convincing than *Donegal* . . . here, the Court is not addressing the *Donegal* question of whether an unlicensed expert should be allowed to testify at trial." *Id.* Further, the *Donegal* case was not decided on the basis of the Federal Rules of Evidence which lay out the exact requirements for expert witness testimony in federal court, as demonstrated in the cases cited directly above.

I. <u>IPP Did Not Violate Either the Federal Wiretap Act or the Florida Security of Communications Act</u>

Defendant claims that the investigation conducted by Plaintiff's investigator violated the federal Wiretap Act, 18 U.S.C. § 2511, and the Florida Security of Communications Act, Fla. Stat. § 934.03. Defendant's argument is conclusory and based upon speculation and a lack of understanding as to how the various relevant technologies work.

The information that IPP collected was readily accessible to the general public. Without factual support for his or her argument, Defendant merely guesses that the information recorded by IPP, such as Defendant's IP address, is not information that is publicly available to normal BitTorrent users (the general public). Defendant repeatedly accuses Plaintiff's investigator of engaging in hacking in order to collect the relevant information about Defendant's infringement. "Mr. Fieser . . . worked as, essentially, a hacker: an unlicensed investigator out of Germany retained to hack into the BitTorrent server and surreptitiously access private communications between BitTorrent users and the BitTorrent server, including the users' IP addresses, download history . . . and other data." Motion, p. 19. Significantly, no part of the foregoing accusation is correct; it was fabricated out of thin air.

17

IPP does not "hack" anything.  IPP's software enters public BitTorrent swarms just as any regular BitTorrent user would.  The swarm contains tens, if not hundreds, of BitTorrent users who are all downloading and uploading the same work between and among themselves.  IPP's system then made a direct connection with a computer connected to the internet through Defendant's IP address.  That computer then transmitted data directly to IPP's investigative server.  All of these steps are taken in the ordinary and normal course of using a BitTorrent protocol and none of them involve "hacking."  The only difference is that instead of using a regular publicly available BitTorrent client to accomplish these steps, IPP uses a specialized client which was developed so that the client cannot redistribute content it receives back into the BitTorrent swarm.  IPP simply made a record of each transaction in which Defendant's computer voluntarily sent pieces of data (here, pieces of Plaintiff's movies) to IPP.  The foregoing makes clear that IPP did not "hack" anything nor "access private communications between BitTorrent users and the BitTorrent server."

Defendant's presumption that IP address information is not available to the public is also false.  IP address information is transmitted as part of the meta-data relayed between computers during a TCP/IP connection.  In discovery, when Plaintiff produces the PCAP (packet capture) evidence of the infringement, which is essentially a recording of the infringement, Defendant will see that the PCAPs clearly show the IP address of the computer sending the data and the IP address of the computer receiving the data.  Anyone can use a free program like Wireshark to capture PCAPs and obtain such information.  Similarly, the "detailed download history, which did not include Plaintiff's works, but of other works to which Plaintiff has no rights[,]" was information that publicly available and required no "hacking" to obtain.

In light of the foregoing, no violation of Florida laws occurred.  "It shall not be unlawful . . . for any person . . . [T]o intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public."  Fla. Stat. § 934.03(2)(h)(1).  Even if the definitions of the relevant terms in the statute could apply to this situation, which Plaintiff does not concede, Plaintiff falls within the exception listed.  Thus, even if IPP's actions could be classified as "interception," it has committed no violation since sharing data through BitTorrent swarms is a means of "communication" that is readily accessible to the general public and anyone could have collected the same information that IPP collected here.

Speculating as to Plaintiff's potential arguments, Defendant asserts that "Plaintiff may argue that FSCA does not apply to the transmission of data over the Internet; however, such a claim would be wrong."  Motion, p. 22.  In support, Defendant cites to *In re Google, Inc.*, 2013 WL 5423918 (N.D. Cal 2013).  Plaintiff does not contest that the FSCA may apply to transmission of data over the internet.  Here, however, there was no unlawful interception of data.  And, Google's technology is not the same as that used by Plaintiff's investigators.  Thus, Defendant's citation to *In re Google* is irrelevant and Defendant's argument fails.

Similarly, no violation of federal law occurred.  As demonstrated above, Plaintiff's investigator did not "intercept" any communications unlawfully.  A computer connected to the internet through Defendant's IP address sent pieces of Plaintiff's copyrighted work directly to IPP's servers in Germany.  Thus, IPP was a participant to the direct transaction.  The Federal Wiretap Act specifically exempts parties to a communication from liability under the Act.  *See* 18 U.S.C. § 2511(2)(d).  Thus, even if IPP's actions could be considered as "interception," because they were a party to the communication and did not intercept it for the purpose of

committing a crime or tort, no violation of the Act occurred. *See also Capitol Records*, 2009 WL 1664468, at *4 (D. Minn. 2009) ("Even if, in capturing the information sent from Defendant's computer, MediaSentry had incidentally violated a private detective licensing statute from some other state, gathering evidence of Defendant's alleged copyright infringement cannot be said to have been accomplished *for the purpose* of committing a tort or crime.")

J.   This Court Should Not Strike IPP's Declaration

Defendant improperly seeks to strike IPP's declaration under Fed. R. Civ. P. 12(f). In doing so, he fails to offer any legal authority to support such a request. "[N]umerous courts in the Eleventh Circuit, and elsewhere, have held that a motion to strike filings that are not pleadings (as defined by Rule 7(a)) is improper." *Keira v. Berry*, 13-60990-SCOLA, 2013 WL 5416900 (S.D. Fla. Sept. 26, 2013). Here, Mr. Feiser's declaration is not a "pleading" as defined by Fed. R. Civ. P. 7(a). And, "[a] motion to strike is a drastic remedy[,]' which is disfavored by the courts and 'will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Thompson v. Kindred Nursing Centers E., LLC*, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002). "Further, when deciding a motion to strike, a court must accept the truthfulness of well-pleaded facts and 'cannot consider matters beyond the pleadings." *Id*. Here, Defendant is attempting to strike a declaration based upon matters beyond the pleadings before discovery has even commenced. This Court should not grant Defendant such relief.

K.   Defendant Has No Basis to Claim Champtery And Maintenance

Defendant's claims of Champerty and Maintenance are pure speculation. Simply paying IPP for litigation services does not equate to champerty and maintenance. Any other "facts" Defendant uses to support his argument are hearsay, based on a random attorney's declaration in

Maryland that has nothing to do with this case.  Defendant's counsel did not even do basic due diligence relating to the actual facts of her allegations before filing her motion.  If she had, she would have learned IPP and Guardaley are separate companies and IPP uses an entirely separate system and software than that in the Guardaley suits cited in the declaration.  Plaintiff hired IPP and not the other way around.  IPP does not financially pay for any part of Plaintiff's litigation; instead Plaintiff is responsible for all costs, including a small fee to IPP to record the infringement.  This arrangement is not improper.  Defendant's counsel is taking the approach of "throw any and all arguments, conspiracies, and exaggerations made against Malibu Media on the Internet (regardless of whether any  is true) into a Motion to Dismiss" in an *ad hominem* effort aimed at diverting attention away from facts and law which actually have bearing on this case.  In doing so, she is merely copying other attorneys who are attempting to employ the same tactics in several other cases brought by Plaintiff around the country.  Defendant's claims are simply frivolous rehashes of unsupported conjectures and conspiracy theories, and they certainly are not grounds to support a motion to dismiss.  *See Hardick v. Homol*, 795 So. 2d 1107, 1110 (Fla. Dist. Ct. App. 2001) ("It is generally accepted that a cause of action for damages arising out of the common-law doctrine of champerty and maintenance as it was then known, is not now recognized.")

> "Maintenance is defined as an officious intermeddling in a suit which in no way belongs to the intermeddler, by maintaining or assisting either party to the action, with money or otherwise to prosecute or defend it." *Kraft v. Mason,* 668 So.2d 679, 682 (Fla. 4th DCA 1996)(quoting 9 Fla.Jur.2d. *Champerty and Maintenance* § 1 (1979)). Champerty, meanwhile, "is a form of maintenance wherein one will carry on a suit in which he has no subject-matter interest at his own expense or will aid in doing so in consideration of receiving, if successful, some part of the benefits recovered." *Id.* (quoting 14 C.J.S. *Champerty and Maintenance* § 1a (1991)).

*Id.* at 1109.

Malibu Media hired IPP for its specific purpose, to accurately record the IP addresses which infringe its property. As set forth above, courts consistently permit litigants to pay others for their support services during the litigation process. Malibu Media files suits to protect its business and it is in control of each lawsuit. Its litigation is not frivolous. And, Malibu Media sought IPP's aid in identifying the infringing IP addresses, not the other way around. Malibu Media sought IPP's services because "the most significant competitive threat to the business of X-Art.com is on-line piracy, and BitTorrent. The website can only compete in a fair marketplace, and cannot compete against free versions of its works." Exhibit A, Field Declaration at ¶ 5.

Attached as an exhibit to its Motion for Leave to take early discovery, Plaintiff explains its purpose for filing this lawsuit. "We spend over two million dollars a year producing content, and millions more each year to run our business." CM/ECF 4-2 at ¶ 14. "Currently we have tens of thousands of members, but we are finding it hard to grow and maintain the memberships as so many people are findings our films for free." *Id.* at ¶ 15. "Each month, approximately 80,000 US residents use BitTorrent to steal our movies." *Id.* at ¶ 16. "We have worked hard and invested millions of dollars in our business in order to produce the best quality product." *Id.* at ¶ 17. "For the first 3 years (when our site was not as popular) we didn't have as many issues with piracy. Now, that our videos are highly desirable, more people steal our videos than pay for a subscription." *Id.* at ¶ 18. "We are even getting many complaints from our members (asking why they should pay when they are available for free on the torrents)." *Id.* at ¶19. "We must protect our copyrights in order to survive and to hope for any growth." *Id.* at ¶ 21. "Without these suits, I believe infringers would feel free to steal our movies without consequence." *Id.* at ¶ 32. "In conclusion, we want the courts to know that we are a small business and we need the law

to be enforced to ensure our survival.  It is getting more difficult for us every day and we hope that in the future there will be a better way to protect our copyrights." *Id.* at ¶ 33.

Malibu Media, the injured party, is consciously bringing this lawsuit because it has no other way to stop the infringement of its movies and protect its business.  As the Field declaration states, "*We* do not pursue our claims against all Doe Defendants." *Id.* at ¶ 26. "*Malibu Media engaged* IPP International UG ("IPP") to detect infringement of its copyright works." Field Dec. at ¶ 6.  This case does not involve champerty or maintenance.

IV.   <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion should be denied in its entirety.

Dated:  July 11, 2014

Respectfully submitted,

By: /s/ *M. Keith Lipscomb*
M. Keith Lipscomb (429554)
klipscomb@lebfirm.com
LIPSCOMB EISENBERG & BAKER, PL
2 South Biscayne Blvd.
Penthouse 3800
Miami, FL 33131
Telephone: (786) 431-2228
Facsimile:  (786) 431-2229
*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 11, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By: /s/ *M. Keith Lipscomb*