```
                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
                      TAMPA DIVISION

MALIBU MEDIA, LLC,                 )
                                   )
    Plaintiff,                     )
                                   )   Civil Action No.
v.                                 )   8:13-cv-03007-JSM-TBM
                                   )
ROBERTO ROLDAN,                    )
                                   )
    Defendant.                     )
_____)
```

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
### WITH INCORPORATED MEMORANDUM OF LAW

COMES NOW Defendant, ROBERTO ROLDAN, by and through his undersigned counsel, pursuant to Rule 56, Federal Rules of Civil Procedure, and moves this Honorable Court for Summary Judgment on all Plaintiff's claims. This motion relies on the affidavits of Defendant, ROBERTO ROLDAN, with incorporated Exhibits; CHRISTIAN HARRIS, Roldan's roommate during the period of alleged infringement, and of VINNIE BENEDUCI, Defendant's childhood friend; Plaintiff's answers to Defendant's interrogatories; and admissions in the court file.

I.  **Introduction**

In the film *Galaxy Quest* (1999), the Thermians, a group of doomed space aliens are in a desperate search for a leader to save their planet from the Sarris Dominion. They intercept a communication showing what they believe to be a heroic

speech by a great spaceship commander. Left in awe, they travel to Earth to meet with him and plead, "Please, commander, you're our last hope." They beam him to their ship so he can to negotiate on their behalf with their enemy. Little do they know, however, that their hoped commander (played by Tim Allen) is no commander at all, but only an actor who played one on TV and now frequents sci-fi conventions, and the speech they intercepted was only one of his monologs. It is, in fact, an epic mistaken identity.

Like in *Galaxy Quest*, the instant case also involves a mistaken identity. Similar to the Thermians, Plaintiff, Malibu Media, intercepted a communication. However, rather than a commander, Malibu Media sought the individual who had allegedly downloaded their pornographic *X-Art* videos using peer-to-peer software.

With the help of an investigator in Germany, Malibu Media obtained an IP address and filed a lawsuit against "John Doe subscriber assigned IP address 96.58.134.12" (Doc. 1).

Through a subpoena to Bright House, Malibu Media was led to a physical address at 4690 57th Avenue North in Saint Petersburg, Florida. They did not send an investigator to the

physical property[1] yet somehow — albeit wrongly — determined that one of the residents was Roberto Roldan and issued a summons to him at that address (Doc. 10).

In reality, Roldan has not lived at 4690 57th Avenue North for more than two years.

In August 2012, Roldan, then 18, moved out of his parents' house to began his first semester at the University of South Florida in Tampa[2]. Since then, Roldan has remained a Tampa resident, living in on-campus dormitories or off-campus apartments throughout his residency.[3]

A journalism major at USF, Roldan works part time as the Managing Editor at the USF student newspaper, *The Oracle*, which is located on the USF campus[4] and where Malibu, after failed attempts to serve Roldan at 4690 5th Avenue North in St. Petersburg, finally served him with a summons for instant lawsuit.[5]

---

[1] Exh. 1 at 8, Plaintiff's answer to Interrogatory No. 20 ("Plaintiff has
[2] Doc. 35, Roldan Affidavit at ¶ 4.
[3] Doc. 35 ¶¶ 5-6.
[4] Doc. 35 ¶¶ 2-3, 18.
[5] Doc. 13, Return of Service stating, in relevant part, "Also attempted at 4690 5th Avenue North . . . informed that the Defendant does not reside here."

Even though Roldan is completely innocent[6] and did not even live in the address associated with the IP address, Malibu Media wrongly stereotyped him as a pornography downloader because he is young and male and named him in the instant litigation with no more "evidence" than speculation and continued their pursuit of him blindly.  The reason, therefore, for this motion, and why it should be granted, is because Malibu Media, in a case of massive mistaken identity, simply sued the wrong guy.

## II.  **Standard**

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The existence of *some* factual disputes between litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[6] Doc. 35 ¶ 3 ("I am not the infringer of Plaintiff's copyrights).

### III. Why Summary Judgment is Proper

Roldan did not live at, nor was he present at, 4690 5th Avenue North in St. Petersburg during the alleged infringement period, and could not have possibly done the downloads.

### A. Roldan did not Reside at 4690 5th Avenue North, St. Petersburg, during the Alleged Infringement Period

As explained above, this action is a case of mistaken identity. Malibu's German investigator determined that some of Malibu's pornographic *X-Art* videos, and many other files (*i.e.* the "Additional Evidence") had been distributed from IP address 96.58.134.12.[7] Malibu subpoenaed Bright House Networks, which identified its subscriber as Angel Roldan.[8] Malibu then did a little "investigation" and "learned" (albeit, wrongly) that Defendant, Roberto Roldan, also lived at that address.[9] Eight month after serving (Roberto) Roldan, Malibu maintains the conclusion that "[a]ll evidence points to Defendant [Roldan] being the infringer."[10])

Like the Thermians' conclusions, Malibu's are mere conjecture and speculation. Malibu's "investigation" and

---

[7] Doc. 8 ¶ 24; Doc. 3-5 ¶¶ 6, 9, 17.

[8] Doc. 8 ¶ 26.

[9] Doc. 8 ¶ 26.

[10] Exh. 1, Plaintiff's answer to Interrogatory No. 17.

"evidence" are fatally flawed[11]; Roldan did not reside at 4690 57th Avenue North, Saint Petersburg, FL 33714 but rather had moved out two years prior.

The times Malibu's investigator allegedly detected *X-Art* videos in the peer-to-peer stream from IP address 96.58.134.12 took place from August through November 2013, or more specifically August 18, 21, 24, 26, 28, 29; September 3, 5, 6, 7, 8, 9, 12, 13, 20, 21, 22, 23, 27, 28, 29, 30; October 2, 3, 4, 5, 6, 7, 9, 10, 11, 12, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 27, 31; and November 1, 2, 3, 4, 7, 19, 20, 24, 25, 26.[12]

Throughout these dates, and since May 1, 2013, Roldan has lived at 13404 Village Circle, Apt. #103 in Tampa,[13] which is a 41-to-45-minute drive from his parents' address at 4690 57th

---

[11] It is no surprise that a Google search or background check would result in incorrect information. *See, e.g.*, Ashlee Kieler, *No Surprise Here: Credit Reports Created with Your Online Information are Mostly Inaccurate*, CONSUMERIST (Mar, 6, 2014), http://consumerist.com/2014/03/06/no-surprise-here-credit-reports-created-with-your-online-information-are-mostly-inaccurate/ (common inaccuracies in consumer reports include "wrong addresses, added or omitted family members") *Accuracy in Criminal Background Checks* (Editorial), N.Y. TIMES (Aug. 9, 2012), http://www.nytimes.com/2012/08/10/opinion/accuracy-in-criminal-background-checks.html (noting that "Inaccuracy is a huge problem when companies buy records in bulk — either from the courts or from other companies — and fail to keep them current.")

[12] Exh. 2, copy of "MySQL File," identified by Plaintiff's answer to Interrogatory No. 8 (identifying the "MySQL Log File which will list each time Defendant's IP Address connected to Excipio's servers and transmitted a piece of any Plaintiff's copyrighted works at issue in this case.")

[13] Doc. 35 ¶ 7.

Avenue North in Saint Petersburg.[14] The affidavit of Roldan's roommate Christian Harris also confirms Roldan lived in Tampa during this period.[15] Finally, Roldan's utility bills and payment receipts for the Tampa apartment, for May, July, August, September, December 2013, and January and February 2014 provide further evidence of Roldan's actual residence at 13404 South Village Circle, Tampa.[16]

### B. Malibu has known Roldan lives in Tampa

Incidentally, Malibu has pursued this lawsuit against Roldan despite notice Roldan did not reside at his parents' house. In investigating for evidence of who may have committed the alleged infringements, Malibu accessed Defendant's Facebook page to see what films and movies he "liked."[17] Roldan's Facebook page has stated that Roldan "[l]ives in Tampa."[18] Additionally, when Malibu attempted service on Roldan at the St. Petersburg address, Malibu's

---

[14] *See* Exh. 3, map showing distance.

[15] Exh. 4 ¶ 5, Affidavit of Christian Harris.

[16] Doc. 35 ¶ 15.

[17] Doc. 8 ¶ 31.

[18] https://www.facebook.com/roberto.roldan.144

process server was told Roldan did not live there.[19] Malibu was, however, able to find, and serve, Roldan in Tampa.[20]

Since being served, Roldan has provided Malibu with documented proof he was in fact residing in Tampa during the period of alleged downloads. Roldan provided a signed lease agreement for an apartment in Tampa, Florida, where he lived from May 1, 2013, through July 31, 2014,[21] which period fully encompasses the period of alleged infringements.

Furthermore, in his motion to dismiss, Roldan again explained that he "did not actually reside in the home where the Internet connection existed for the subject IP address" and explained the logical fallacy of Malibu's conjecture that he downloaded the *X-Art* videos just because on Facebook Roldan had "liked" some of the same very popular television shows and music that Malibu's "investigator" had identified as being also downloaded from the subject IP address.[22] By this same flawed logic, several million other fans of The Beatles and *Star Wars* must also be guilty.

---

[19] Doc. 13.

[20] Doc. 13.

[21] Copy at Doc. 35, Exh. B.

[22] Doc. 16 at 4-5.

In response, Malibu Media replied, "While it may be true that Defendant like popular entertainment, the infringement was traced to *Defendant's father's home*" (Doc. 21 at 5, emphasis added).

Simply, Malibu raised this action against Roldan without any sufficient evidence. Even if Malibu had somehow speculated that Roldan had caused the infringements during weekend visits at his parents' house, they failed to consider that, given Roldan's class and work schedule, most of the alleged infringements were made on weekdays. An additional, common-sense fallacy begs the question: If a young man were to download pornography, why do such a personal, private, and embarrassing thing *while visiting his parents*?

### C. Roldan Could Not Have Possibly Visited His Parents' Home During the Period of Infringements As Often as Needed to Cause All of the Downloads

All the alleged downloads in Exhibits A and B of Malibu's Amended Complaint were detected as actively occurring through IP address 96.58.134.12 between August 18 and November 26, 2013.[23] Bright House identified 4690 57th Avenue North, Saint Petersburg, FL 33714, as the address corresponding to IP address 96.58.134.12. Therefore, if Roldan had infringed Malibu's copyrights, as Malibu alleges, using IP address

---

[23] Exh. 2; *see also* Doc. 8 ¶ 17 and Doc. 8-1 ("Hit Dates").

96.58.134.12, he would have had to use a computer at 4690 57th Avenue North in Saint Petersburg. Overall, this means that Roldan would have had to have his computer at his parents' house on each of the 54 dates in August, September, October, and November 2013 when Malibu has accused him of uploading their films through BitTorrent.

An initial file download through BitTorrent software must be done manually. "To begin participating in BitTorrent downloads, each user (or "peer") downloads a program (or 'client') capable of running the BitTorrent protocol. Once the client is installed, the peer can search the Internet for a 'torrent' file matching the film the user wants to download." *Malibu Media, LLC v. Does 1-28*, 295 F.R.D. 527, 529 (M.D. Fla. 2012). Thereafter, as long as the BitTorrent software is running, the file can be uploaded to other BitTorrent users automatically. *Id.* In other words, the BitTorrent user has to manually choose to download a file while its distribution to other users is performed automatically and simultaneously through the BitTorrent software.[24]  Therefore, Roldan would

---

[24] Thus, it is very important to Plaintiff that IPP's software does not automatically upload these files, because, in essence, Malibu Media, through its agent IPP, would be distributing its own films through BitTorrent, and would have implicitly allowed or licensed such use, if the files IPP allegedly downloaded from IP address 96.58.134.12 were automatically uploaded to other BitTorrent peers.

have had to manually downloaded each of the files listed in Exhibit A and B of the Amended Complaint (Doc. 8). However, these files could be automatically distributed to other BitTorrent users without Roldan's interception, as long as his computer was running and connected to the Internet through IP address 96.58.134.12. What this means for Roldan is that, for a BitTorrent software application to have uploaded any of the subject works from his computer, he would had to have had his computer on and running at his parents' house during the 54 alleged times when Malibu allegedly detected IP address 96.58.134.12 within the BitTorrent stream.

In Exhibit B to its Amended Complaint, Malibu indicates the date of first publication for each title. (Doc. 8-2.) Since each film was not made public before the date of first publication, Roldan could not have downloaded any of the films before their first date of publication. As the download must be done manually, Roldan would have had to have caused these downloads, on or after the date of each publication, while connected to the Internet at his parents' house.

For example, *A Perfect Match* was first published on Wednesday, September 11, 2013. Malibu allegedly uploaded it from Defendant on September 12, 2013 at 1:54am, 4:49am,

6:27am, 8:42am, 9:42am, 10:42am, and 12:36pm EST.[25] Therefore, between September 11 and 12, Roldan would have had to have downloaded *A Perfect Match* and had the BitTorrent software running at his parents' house during each time when Malibu's German investigator allegedly intercepted the upload. However, on September 11, 2013, Roldan had class from 9:40 to 10:30 a.m. and worked at *The Oracle* from at least 5 to 10 p.m. The next day he was in classes again from 12:30 through to about 4:50 p.m.[26] To effect the download, he would have had to have spent the night at his parents' house and missed class the next day.

Another example, *First and Forever* was not published until September 21, 2013; therefore Roldan could not have have caused this download until at least that date of publication and would have had to have his computer running at his parents' house throughout each of the "hit" times for that film: September 22, 2013, at 9:34 p.m., 9:46 p.m., 10:58 p.m., 10:59 p.m., 11:26 p.m., and September 23, 2013, at 6:20 a.m., 6:47 a.m., 11:17 a.m., 12:22 a.m., and 12:23 a.m.  However,

---

[25] Exh. 2 at 2, copy of "MySQL File," identified by Plaintiff's answer to Interrogatory No. 8 (identifying the "MySQL Log File which will list each time Defendant's IP Address connected to Excipio's servers and transmitted a piece of any Plaintiff's copyrighted works at issue in this case."); see also Doc. 8-1 at 2, PageID 62, showing last time stamp in UTC.

[26] Doc. 35 (explaining his class schedule on Thursdays to include CRW 2100 from 12:30-1:45 p.m. and IDH3400 from 2-4:50 p.m.).

these September 22, 2013, hits could not have possibly come from Roldan's computer because, on September 22, 2013, Roldan worked at *The Oracle* until about 10 p.m. and then spent the night at his friend Vinnie Beneduci's house.[27]

Furthermore, there is a very narrow window between the date of first publication and the first hit date for several of the films, creating a narrow timeframe in which Roldan had to get to his parents' house and initiate the download so that Malibu could have intercepted it by the alleged "hit" times. By comparing where these narrow timeframes overlap[28] and where they don't, it becomes apparent that Roldan would had to have gone to his parents' house at least 20 times over the course of 12 weeks to effect the download of each film in time to make it available for upload by Malibu on the alleged "hit date."

During the period of the alleged infringement, Roldan took 15 credit hours of classes a week and worked 15 to 20 hours a week at *The Oracle*.[29] On top of that, Roldan did an average of 8 to 12 hours of homework each week.[30] Furthermore,

---

[27] Doc. 35; Exh. 5 ¶ 5 (affidavit of Vinnie Beneduci).

[28] *See* chart at Exh. 6.

[29] Doc. 35 ¶¶ 19, 23(a).

[30] Doc. 35 ¶ 23(g).

Roldan lived in an apartment in Tampa.[31] Therefore, it would have been entirely impossible for him to have committed the downloads for all of the hit times listed at Exhibit "2."

Moreover, analyzing these nine pages of times Malibu has alleged that Roldan had his computer connected at his parents' house and was there downloading pornography, it becomes apparent that Roldan could not have possibly performed these downloads and uploads and still managed his class and work-load at USF, about 40-45 minutes away from his parents' house. Roldan could not have left his computer running at his parents' house while he went to work or school because Roldan uses his computer for work and school.[32]

During many of the times of alleged infringement, Roldan has documented that he was either at work or in class. For example, an examination of a few randomly selected "hit" times[33] reveals:

| 9/3/2013 4:13 PM | Roldan was in class until 4:45 p.m. this day |
| 9/3/2013 4:15 PM | Roldan was in class until 4:45 p.m. this day |
| 9/3/2013 4:42 PM | Roldan was in class until 4:45 p.m. this day |
| 9/3/2013 5:52 PM | Roldan started work at 5 p.m. this day |
| 10/2/2013 6:45 PM | Roldan started work at 5 p.m. this day |
| 10/2/2013 6:46 PM | Roldan started work at 5 p.m. this day |

---

[31] Doc. 35 ¶ 14; Exh. 4.

[32] Doc. 35 ¶ 16.

[33] Complete list at Exh. 2.

| 10/2/2013 7:18 PM | Roldan worked from 5-10 this day |
| 10/22/2013 11:45 AM | Roldan had to be in CRW2100 by 12:30 p.m. |
| 10/22/2013 11:57 AM | Roldan had to be in CRW2100 by 12:30 p.m. |
| 10/22/2013 2:56 PM | Roldan was in SYG2010 from 2-4:45 p.m. |
| 10/22/2013 3:38 PM | Roldan was in SYG2010 from 2-4:45 p.m. |
| 10/22/2013 3:43 PM | Roldan was in SYG2010 from 2-4:45 p.m. |
| 10/22/2013 5:09 PM | Roldan worked from 5-10 p.m. |
| 11/4/2013 10:15 AM | Roldan was in POS2112 from 9:40 to 10:30 a.m. |
| 11/4/2013 11:18 AM | Roldan was in POS2112 until 10:30 a.m. |
| 11/4/2013 4:54 PM | Roldan worked from 5-10 p.m. |

It is important to realize that Roldan could not have possibly left his computer running at his parents' house, allowing the BitTorrent uploads to have automatically continue, because Roldan kept his MacBook Pro with him at all times,[34] as he needed it for taking notes in class, working on his homework,[35] attending his online class, MUH 3016 Survey of Jazz, and doing his job as Managing Editor at *The Oracle*. Roldan did not leave his computer at his parents' house.

In summary, for all of the downloads and uploads to have occurred at the times Malibu has alleged, Roldan would had to have left his computer running, virtually nonstop at or near his parents' house during the entire period from August through November 2013. If his computer were at his parents'

---

[34] Doc. 35 at 3 ¶ 16.

[35] Roldan does not skimp on his schoolwork. He is an honors student and the recipient of a Fulbright award. *See, e.g.*, Roberto Roldan profile on the Fulbright Commission website: http://www.fulbright.org.uk/about/meet-our-fulbrighters/roberto-roldan/796

house this whole time, he would not have been able to use it for school, work, or his own personal pleasure. It would have been impossible for Roldan to have performed these downloads and uploads — even if, *arguendo*, he had frequently visited his parents between August 18, 2013 and November 7, 2013 (which, as described below, he did not) — simply, he would have had to have been in two places at the same time.

### D. Defendant Did Not Visit His Parents' Home Throughout the Period of Alleged Infringement

Even though, as explained above, there are many reasons why the downloads and subsequent uploads on BitTorrent would have been impossible, these reasons do not really matter, because Roldan *did not visit his parents even once* during the period from August 18 to November 7, 2013. As demonstrated previously, BitTorrent downloads have to be done manually. By considering the dates of first publication of the allegedly infringed films were published intermittently from August 5, to November, Roldan would had to have downloaded each film only when it became available on its first date of publication. Based on the dates of first publication and "Hit date" alleged by Malibu, Roldan would had to have visited his parents dozens of times over the course of 12 weeks to have caused the alleged infringement. However, Roldan did not

visit his parents even once from August 5, 2013, through November 17, 2013.[36] As a result, although he did not leave a computer running at his parents' house, it would not even matter if Roldan had because he would had to have visited his parents' house during the many overlapping times of infringement to manually download each infringed film. As Roldan did not return even once during the period of infringement, it is impossible that Roldan caused these downloads. As a result, summary judgment should be granted in favor of Defendant, Roldan.

## IV. Conclusion

While it may be true that someone uploaded *X-Art* videos from the IP address in question, such person was not Roldan. Just like the Thermians in *Galaxy Quest* misidentified Tim Allen's character, Jason Nesmith, as a war hero when he was only an actor; Malibu Media has misidentified Roldan as an infringer, with nothing more than speculation and guessing. Thus, for the reasons set forth above, final summary judgment should be granted in favor of Roldan. Because of the scattered publication dates for the allegedly infringed films, Roldan would have had to have visited his parents on at least

---

[36] Doc. 35 ¶ 17.

twenty separate occasions during the period of infringement. This fact alone would make it nearly impossible for Roldan to have caused all of the alleged downloads. However, because Roldan did not visit his parents' home at all during the period of infringement, it is in fact impossible for Roldan to be the infringer, even if he did leave a computer running at his parents' home.

WHEREFORE, Defendant, ROBERTO ROLDAN, respectfully requests that this Honorable Court enter a FINAL SUMMARY JUDGMENT on the merits against Plaintiff, MALIBU MEDIA, LLC.

### CERTIFICATE OF SERVICE

I hereby certify that I filed electronically the foregoing with the Clerk of the Court via CM/ECF system which will notify electronically all parties.

*Attorney for John Doe:*

**Cynthia Conlin, P.A.**
1643 Hillcrest Street
Orlando, Florida 32803
Tel 407-965-5519
Fax 407-545-4397
www.cynthiaconlin.com

/s/ Cynthia Conlin, Esq.
CYNTHIA CONLIN, ESQ.
Florida Bar No. 47012
cynthia@cynthiaconlin.com