## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| MALIBU MEDIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 8:13-cv-03007-JSM-TBM |
| | ) | |
| ROBERTO ROLDAN[1] and | ) | |
| ANGEL ROLDAN, | ) | |
| | ) | |
| Defendant(s). | ) | |
| _____ | ) | |

### RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS

COMES NOW Attorney Cynthia Conlin and hereby files this memorandum in opposition to Plaintiff's motion for sanctions (Doc. 67)

### I.      Introduction

Plaintiff launches its vilifying motion (and continues it) with a litany of speculation and twisted facts.   It starts by referencing its own "pre-suit investigation" into whether Roberto Roldan may have infringed its copyrights (Doc. 67 at 2); however, the "investigation" — an unverified Accurint® report[2] — was careless and negligent. Plaintiff had a duty pursuant to LexisNexis's warnings[3] to conduct an additional investigation as to

---

[1] Roberto Roldan is not technically a Defendant at this time because Plaintiff improperly omitted him from its second amended complaint (Doc. 61) after this Court ordered Plaintiff expressly not to (Doc. 58).  A motion for order to show cause is pending (Doc. 75).

[2] See Doc. 53 at 2 ("because LexisNexis's Accurint database identified Roberto as residing at Angel's house until January of 2014 . . . Plaintiff established a reasonable prima facie basis for believing that Roberto was the most likely infringer.")

[3] Accurint®   for   Legal   Professionals,   http://www.lexisnexis.com/enus/products/accurint-for-legal-professionals.page ("Before relying on any data, it should be independently verified").

whether Roberto Roldan actually lived in the house associated with the IP address.  This duty was heightened when Plaintiff's process server was given contradictory information: that Roberto Roldan did not reside at that address.  Plaintiff, however, admittedly failed to do *any* further investigation.[4]

The undersigned brought Plaintiff's carelessness to the court's attention (*i.e.* Doc. 54 at 4-6).  Plaintiff has, in retaliation, lashed out in an emotionally charged, angst-ridden motion for sanctions.  Plaintiff's other reasoning for retaliating against the undersigned is simply because it is now faced with the likely prospect of losing a case on the merits against a "prevailing party" Defendant, and it will fight to the bitter end before it that happens.

Plaintiff also includes false statements that are not relevant to its motion merely to inflame and as improper character attacks.  For example, Plaintiff's assertion that Defendant admitted to "infringing" works (Doc. 67 at 2) is an unsupported legal conclusion.  Secondly, Roberto was *never, ever* "a likely suspect"; he is an upstanding citizen and a Fulbright scholar, and Plaintiff *knows* he is innocent of Plaintiff's allegations; such accusations are uncalled for.

This mudslinging is just a taste of Plaintiff's motion, which is filled with hyperbolic character assassinations such as Conlin having "hatched a plan." These allegations are wholly unsupported and without merit.  Overall, the 28 U.S.C. § 1927 motion lacks foundation, as it is based on the wrong, unsupported conclusion that Attorney "wrongfully and unethically withheld" "exculpatory evidence."  Most importantly, despite Plaintiff's repeated use of the word "unethical," Plaintiff has not, nor cannot, show the requisite "bad faith."

---

[4] *See, e.g.*, Doc 36-1 at 8, Plaintiff's answer to Defendant's Interrogatory No. 20 ("Plaintiff has never sent an investigator to or neighbor Defendant's property to investigate the Defendant on location").

### III.     Legal Standard: "Bad Faith" is Required

As Judge Moody recently explained:

> In the Eleventh Circuit there are three requirements a party must satisfy with respect to an award of sanctions under § 1927: (1) an attorney must engage in unreasonable and vexatious conduct; (2) such unreasonable and vexatious conduct must multiply the proceedings; and (3) the amount of the sanction cannot exceed the costs occasioned by the objectionable conduct.

*Kahama VI, LLC v. HJH, LLC*, No. 8:11-CV-2029-T-30, 2013 WL 5954779, at *3 (M.D. Fla. Nov. 7, 2013) (denying a motion for sanctions filed) (citing *Norelus v. Denny's, Inc.,* 628 F.3d 1270, 1281 (11th Cir. 2010)) (internal quotations omitted).  An attorney multiplies court proceedings "unreasonably and vexatiously," thereby justifying sanctions under 28 U.S.C. § 1927, only when the attorney's conduct is so egregious that it is tantamount to bad faith." *Id.*; *accord*, *Peer v. Lewis,* 606 F.3d 1306, 1314 (11th Cir. 2010) (the "unreasonable and vexatious" conduct must be "tantamount to bad faith").

Furthermore, "[t]he Eleventh Circuit has long held that the provisions of § 1927, being penal in nature, must be strictly construed." *Id.*  "Section 1927 is not a 'catch-all' provision available to punish counsel for any objectionable conduct." *You Fit, Inc. v. Pleasanton Fitness, LLC*, No. 8:12-CV-01917-JDW, 2013 WL 2449497, at *1 (M.D. Fla. June 5, 2013) (citing *Schwartz v. Millon Air, Inc.,* 341 F.3d 1220, 1225 (11th Cir. 2003)).

### IV.     Conlin did not engage in "Bad Faith"

Because no conduct so egregious that would amount to "bad faith" would justify sanctions, the Court must find sanctions pursuant to 28 U.S.C. § 1927 unwarranted.

### A.    The motion to dismiss was not frivolous

Plaintiff's first argument relates to a motion to dismiss (Doc. 16) and is wholly without merit. Although the motion was ultimately denied, it was clearly not "frivolous." First, it raised recent, relevant orders in the Southern District of Florida in Case Nos. 1:14-cv-20213-UU, 14-20216-FAM, and others dismissing nearly identical complaints filed by Plaintiff for the basic reason that Plaintiff had no evidence, other than an IP address, to identify Defendant individually. The motion also questioned that the "investigation" by which Plaintiff obtained the IP address was unreliable in that it was obtained by an unlicensed "investigator" who was paid in part on a contingency-fee basis. The reason for the number of pages filed was to include the complete, rather than part, record to show the contingency-fee relationship, among other questionable aspects of Plaintiff's "investigator."

As to Defendant's own factual assertions of where he resided at the time of download, while mentioned in the motion to dismiss (Doc. 16 at 3-4), such were not the motion's focus because, "at the motion to dismiss stage, a judge assumes 'that all the allegations in the complaint are true (even if doubtful in fact).'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 589 (2007). Procedurally, because the factual assertion of where Defendant resided specifically contradicted allegations in the amended complaint, it was an issue for summary judgment — not a motion to dismiss.

Moreover, this motion raised no new or novel arguments. Plaintiff had already seen and briefed a response to the legal arguments raised therein. The arguments had been raised and were awaiting ruling in other like cases, including, for example, *Malibu Media v. Doe*, 1:14-cv-20393-CMA [Doc. 9] (S.D. Fla., May 22, 2014).

On June 27, 2014, at the time Defendant filed its motion (Doc. 16), in another case (1:14-cv-20393-CMA [Doc. 17] (S.D. Fla.)), Plaintiff had *already* filed a response to another motion to dismiss that presented the same exact legal arguments raised therein. **Plaintiff's** response in the instant case is *virtually identical — word for word —* to its response filed in SDFL 1:14-cv-20393-CMA [Doc. 17] (copy at **Exhibit "1"**).   The affidavit attached to Defendant's motion to dismiss was likewise not new to Plaintiff, as it was pulled from another, also similar, *Malibu Media* case, included discovery responses obtained in another case, and was subsequently filed in several other *Malibu Media* cases.   Therefore, the statement that "Plaintiff spent scores of hours trying to understand these documents' relevancy" (Doc. 67 at 4) is patently false, especially in reference to the instant case.

**B.** **Conlin did not withhold evidence in "Bad Faith"**

Next, Plaintiff again misconstrues the facts, this time misstating that it "took seriously" Roberto's defense and "requested further information" (Doc. 67 at 4).

When Roberto provided documents supportive of Roberto's factual defenses, it was not pursuant to a "request for further information" as Plaintiff implies (Doc. 67 at 4); it was in his mandatory Rule 26 disclosures, which Plaintiff failed to examine.   Now, faced with the reality of having made a mistake (and as such may be required to pay Roberto's "prevailing party" attorney fees), Plaintiff is backpedaling in a desperate attempt to shift blame onto Roberto's attorney.   It even lifts Roberto's attorney's own "sit on" language, previously applied to Plaintiff's error, in, "Plaintiff, since July 28, 2014, sat on Defendant's initial disclosures" (Doc. 54 at 9).

Defendant made absolutely no requests for "information" that were narrowly tailored to Roberto's case; rather, it merely propounded standard stock requests it propounds in its other cases (Doc. 54-2). Besides being grossly overbroad (esp. No. 1), these poorly written requests had absolutely nothing to do with the allegations in Plaintiff's complaint because all requests substantially asked Roberto about *his own* address.  Why, for example, would documents showing that Roberto was not at *his own residence* have anything to do with Roberto being at the residence with the IP address? (Doc. 54-2 at 10.)  Because Plaintiff failed to tailor its discovery requests to the facts of the specific case and instead used the same, cookie-cutter requests it does in every other case, its requests, as written, were wholly irrelevant and caused a delay in the proceedings. Plaintiff never simply propounded, as it alleges, a "request for evidence showing that Roberto did not have access to *Angel's* home" (Doc. 67 at 5). Despite that Plaintiff was the one with the burden of proof, Plaintiff would have the Court hold that the undersigned should be sanctioned for not interpreting Plaintiff's discovery requests to mean something completely different from what they actually said.

This whole argument, however, is mere smoke and mirrors to detract from Plaintiff's failure to examine Defendant's initial disclosures — a fact Plaintiff wishes to hide so strongly it has concocted a cover-up story.  In its motion, Plaintiff falsely says that it "took seriously" Roberto's defense and "suspected Roberto had been living at both his parents' house and his nearby [40 miles away] college apartment."  A brief explanation of the timeline seems to be in order.

In July 28, 2014, I served Roberto's initial disclosures, which included a 16-page lease agreement showing where Roberto resided throughout the relevant time period, account

summaries for his college tuition fees, 21 pages of utility payment receipts and utility bills, and a housing and residential room condition report signed in May 2013.   At the time, I expected Plaintiff's attorney to contact me to discuss these documents, which clearly showed that, during the alleged download period, Roberto lived in a wholly separate address from the address corresponding to the IP address.   However, despite this proof that Roberto resided in another location and had been paying its utility bills, and had been a full-time student[5] at the University of South Florida since Fall 2012, Plaintiff pressed onward with its prosecution.

Realizing that Plaintiff was going to continue its prosecution, I therefore moved forward with the duty to defend.   Starting in August and continuing through September, 2014, Attorney Jennifer Reed, an associate working for my office, began conferring with the client and witnesses to collect evidence that might be helpful in a motion for summary judgment. The extremely time-intensive challenge in collecting the supporting information was to eliminate any issue of material fact that Roberto Roldan did not have his computer running at the residence of the subject IP address during each of 48 different alleged "hit" times listed in Doc. 8-1 between August 18 and November 7, 2013.

In September 2015, Attorney Reed prepared a first draft of a month for summary judgment along with an affidavit for Roberto, which she emailed to him to return to us, signed and notarized, in the postal mail.   She collected Roberto's lease agreement, utility bills, and receipts of utility payment (all of which we had also already produced); and some new

---

[5] Malibu Media's founding member Colette Field has stated publicly she does not "want to cause anyone financial hardship" or for "students" or members of the military to be sued for illegal downloads. Traci L. Moyer, *Slapped with Stealing Sexual Content*, THE HERALD BULLETIN (Sept. 27, 2014) at http://www.heraldbulletin.com/news/local_news/local_business/slapped-with-stealing-sexual-content/article_3c76dcfe-45dc-11e4-8fe7-6b5fd2dbcc10.html

information, including college transcripts; time sheets and work schedule; course syllabi; and debit card statement.

Afterward, Attorney Reed sat down with me to explain that, although we were able to collect some information for Roberto's whereabouts for some of the 48 different times, she was not entirely confident that the motion contained no issue of fact, as some of the "hit times" were still left unaccounted for.  Based on our decision, I concluded that the timing was simply not right to file the motion, as the risk of losing seemed too high.  As a matter of strategy, without reading the motion, I told Attorney Reed to shelf the motion to be revisited at a later time in the case.  We would for now switch our energies to other issues and revisit the motion for summary judgment later, probably after we had propounded and obtained discovery that might fill in the gaps.

Meanwhile, Plaintiff propounded discovery requests, that, given the documents and argument we had provided, made no sense.  Plaintiff granted us an extension, which was normal, as we usually do the same thing whenever Plaintiff wants an extension.  We litigate several cases against Plaintiffs and have, for the most part, maintained an amicable relationship.  Therefore, the extension was not a big deal, and Plaintiff did not press it.  The discovery deadline was plenty of time away, and no party was prejudiced by any delay.

On October 1, 2014, we served Plaintiff with Defendant's answers and objections to Plaintiff's First Interrogatories.  Therein, we again stated that Defendant's address was in Tampa, not at the house associated with the IP Address, which is in St. Petersburg, and repeatedly objected based on relevance because Defendant resided in Tampa at all times relevant to the litigation.  These objections were important because the interrogatories were

not tailored to the facts of the instant case.  For example, Plaintiff asked things like, "Identify each wireless router or modem used **in your home** during the preceding two years" (No. 5) and "create a diagram" of "your house, apartment, or dwelling in detail" (No. 7).  As we had already shown to Plaintiff, Roberto's home had nothing to do with the house where the IP address was located.

Unknowingly, we inadvertently did not include in that discovery response a response to Plaintiff's requests for production.  However, we heard nothing from Plaintiff's attorney until a month and a half later, when Plaintiff's attorney, on November 14, 2014, emailed my assistant and asked, "I was reviewing this case and just realized, while I do have some documents which were produced, I do not have record of the responses to Plaintiff's Requests for Production. Can you please send me a copy of Defendant's Reponses as soon as possible?"

Therefore, while I admit that we (unknowingly) delayed in producing a response, the delay was not at all as Plaintiff represents because (1) it was inadvertent and (2) it took Plaintiff a month and a half to realize it.  Regardless, after this notification we hurried to turn in the response.

The problem with Plaintiff's requests for production of documents (Doc. 54-2) was that, not only were they grossly overbroad, but, like the interrogatories, they had nothing to do with Roberto's factual defense of not residing in the home with the IP address.   This irrelevance made the requests appear burdensome and harassing — and difficult to respond to.  Plaintiff did not ask Roberto for his time cards or class schedules, or for any witness statements to support his defenses, documents that Plaintiff now accuses me of "sitting on."

Rather, Plaintiff sought a forensic clone of each of Roberto's Computer Devices (No. 1); complete records of his Internet browsing activity (No. 2); purchase receipts for Roberto's computer (No. 3) and router (No. 4); user guides for his router (No. 5); all software programs or applications on all of his Computer Devices (No. 6); all communications and billing records with Roberto's ISP (No. 7); receipts for anti-virus software (No. 8); forensic copies of all external hard drives (No. 9); all files saved in any "electronic storage locker" (No. 10), in "any cloud based storage system" (No. 11), or on "any video game consoles" (No. 12); everything related to video-game network connections (No. 13); everything related in any way to all mobile devices (Doc. 14); real property deeds, titles, or leases (Doc. 16); recent communications mentioning Plaintiff's works (Doc. 17); forensic software (No. 18); and proof of all purchases of electronic equipment (No. 19).

Buried among all of these substantially irrelevant requests was the crudely written Request 15, which appears to be the focus of Plaintiff's motion for sanctions.  It sought:

> documents pertaining to receipts of purchases, credit card statements, checks cashed, bank account statements, or travel documents dating two months before and until and including two months after the time of the alleged infringement that would indicate that you were not at **your residence** or within the control of **your IP address** at or around the time of infringement

(Emphasis added).  Reviewing the 19 requests as a whole, including Request 15, it was clear that Plaintiff had not made any effort to draft requests that were reasonably calculated to lead to the discovery of admissible evidence or to tailor its requests to the facts of the case.  In our November 21, 2014, response, we objected that Request 15 was wholly irrelevant as worded

because documents showing Roberto was not at his residence or within the range of its IP address had absolutely nothing to do with issues in litigation.

After we produced our response, Plaintiff only showed interest about its Request No. 1, for Roberto's hard drive.  Plaintiff wanted its "expert," former law enforcement officer Patrick Paige, to perform a forensic search on the hard drive of Roberto's computer.  The same issue was also happening in another, similar case in Miami — also between Malibu Media and a "John Doe" I represented (Case No. 1:14-cv-20393-CMA).  Plaintiff was being much more aggressive with its hard drive requests in the Miami case, and a lot of discussion was going back and forth about what Plaintiff believed to be its right to have its own expert search a Defendant's hard drive as a simple discovery request.  Additionally, we were also representing the Defendant in a third *Malibu Media* case, in Orlando, Case No. 6:13-cv-01959-CEM-KRS, which had also begun the discovery phase.  So there was a lot of discussion, and Plaintiff, seemingly more focused on the Miami case, did not ask any other details as to why Roberto Roldan did not reside in the house.  It did not ask for a follow-up of Request 15.  It merely focused, repeatedly, on the hard drive, the production of which seemed practically absurd because it had nothing to do with, and had not even been used at, the house with the IP address.  There was simply no connection.

After a month and a half of silence from Plaintiff as to Request 15, on December 29, 2014, Plaintiff's attorney served a 13-page, single-spaced letter regarding Defendant's objections to Plaintiff's Requests for Production (Doc. 54-3).  Plaintiff served this letter days after another, 19-page letter sent on December 23, 2014 (copy at **Exhibit "2"**), which regarded Defendant's interrogatory answers.

After our office got back from a holiday break, I delegated the task to respond to these 32 single-spaced pages of discovery-dispute correspondence to Attorney Reed, who, on January 5, 2015, began conferring with Attorney Shatz as to the interrogatory disputes, trying to get him to agree to more narrowly tailored and relevant language, and working on amended interrogatory responses.

The following week, Attorney Reed focused on Attorney Shatz's lengthy, December 29, 2015, letter, reviewing each item, conferring with counsel for Plaintiff in an attempt to compromise, and preparing amended responses pursuant to any compromised language.

During this period, Plaintiff's attorneys were focused mainly on Roberto's hard-drive and demanded that we tender it to Patrick Paige, and they were letting this be known through various telephone conferences. This focus on the hard drive admittedly took some of the focus away from their other 18 requests. They were doing the same thing in the Miami case, as well — demanding the client's hard drives — and, the request itself being wholly improper and overbroad, the topic became at a focal point. As the Miami case had a very similar trial schedule, much of the activity in the two cases was aligned.

At first, we thought that we could agree to some sort of confidentiality agreement or protective order as to Roberto's hard-drive, and we tried to make compromises. However, Plaintiff would not budge on the fact that it wanted its "expert," Patrick Paige, to conduct a forensic search to see if any "spoliation" had occurred. Furthermore, they insisted on entering into an agreed protective order that not only related to this one item but gave Plaintiff cart blanche to label any item they produced in the future as "confidential" and have such designated by the Court. Therefore, we were forced to expend hours of resources to research

case law to exactly what, if any, access, a litigant is allowed pursuant to the Federal Rules of Civil Procedure.

On or about January 13, 2015, after weeks of discussions and multiple drafts of Plaintiff's proposed protective order, we still could not arrive at a solution and it became apparent that court intervention would be necessary.   We began drafting a motion for protective order to protect Roberto from having to tender his hard drive to Patrick Paige. Therein, we cited to *In re Ford Motor Co.*, which provides: "Rule 34(a) does not grant unrestricted, direct access to a respondent's database compilations." 345 F.3d 1315, 1316-17 (11th Cir. 2003).   Likewise, in the near-parallel Miami case, we worked with Plaintiff's counsel to schedule a discovery hearing before Magistrate Judge John O'Sullivan, and did coordinate one for January 22, 2015.

That day, Plaintiff also asked us to agree to an extension of time to allow Patrick Paige to search Roberto's hard drive.  After looking at their proposed motion, I said I would agree to a deadline extension but not the language they inserted about their "expert's" right to search the hard drive.  I expressly stated that I wanted to file a response to clarify Roberto's position. I prepared a short response and waited for Plaintiff's motion to be filed.  I recall waiting all evening for Plaintiff's attorneys to file their motion, then going home thinking that, given our disagreement, they would probably rewrite their motion for a filing tomorrow.   The next morning I learned that at 10:41 p.m. they had filed their motion, exactly as proposed before my objection, and an endorsed order had already been entered at 8:27 a.m. (Doc. 33) before I had a chance to file a response. I believe that Plaintiff's attorney intentionally delayed filing

the motion to prevent me from filing a response that evening.   To preserve my client's position, I filed Defendant's response anyway (Doc. 34).

Meanwhile, having at least temporarily ironed out the hard-drive issue, we continued to work on the remaining discovery issues.  On January 14, 2015, Attorney Reed logged 4.47 hours of time working on an amended response to Plaintiff's requests for production.  She suggested that, pursuant to the agreed rewording to Plaintiff's Request 15, we should submit bank statements showing specific times that Roberto was obviously not at the download address.  We discussed the issue and, even though Plaintiff's request did not specifically ask for work time records, syllabi, or class schedules, we agreed in good faith to produce them too because we intended to use them to show that Defendant was not near the home with the IP address during the relevant time period.

On January 15, 2015, I reviewed the drafted production responses and served them on Plaintiff.

### C.      No Bad Faith in Filing Motion in January

At this point, I was still not 100% convinced we had enough evidence to prove no issue of material fact.  However, because of the recent energy spent on the case, it seemed the time was right to revisit the motion for summary judgment.  I instructed my legal assistant to conduct further fact-finding research and do a comparison to new discovery documents we had recently received from Plaintiff, including additional "hit" times, so we could do more elimination.  He checked for any discrepancies in the dates of the alleged downloads and created a chart (for our own internal use) comparing Roberto's class schedules and work schedules.   Meanwhile, I also began to review, for the first time, the rough draft motion for

summary judgment Attorney Reed had shelved in September to see what, if any, more evidence we needed to add.   I continued my work on the motion the next day and was able to include Plaintiff's interrogatory answers.   I took much detailed time scrutinizing the dates in the additional hit times we had received from Plaintiff along with our client's records.

At 7:42 p.m. on Friday, January 16, 2015, Attorney Kennedy sent us that ridiculous email (Doc. 67-2) asking us to "stop working" on the case so Plaintiff could conduct additional discovery.   I was flabbergasted.   I could not understand why Plaintiff alone should have the right to continue discovery, including depositions, but Defendant should cancel everything and "stop working."   If Plaintiff wanted Defendant to "stop working," it needed to make a settlement offer or file a motion for voluntary dismissal, not just demand that Defendant "stop working." It simply was not fair that, with a discovery deadline around the corner, Defendant should "stop working" on the case while Plaintiff undertakes a fishing expedition.   As long as Roberto was a Defendant, I had a duty to defend him — and continue "working" on his defenses. To "stop working" would not be in his best interest.   It became apparent that Plaintiff was looking to squirm out from having Defendant declared "prevailing party" in the case that Plaintiff had wrongly raised against him.   This was a terrible and unjust abuse of process.

By Monday, I was confident the motion was ready to file — and I filed it.   There was no bad-faith, no intention to "sandbag," only the zealous duty see my client prevail on the merits as he deserved.   Plaintiff's contemptuous histrionics over being "sandbagged" are simply disingenuous.   Plaintiff suggests that if we had served it with evidence and filed the motion in September that Plaintiff would have moved to dismiss the claims against Roberto

immediately.  Even after receiving Roberto's additional evidence and motion for summary judgment, however, Plaintiff continued to maintain a position of assumed superiority.  It even filed a response memorandum to the motion and sought to conduct — and did conduct — depositions.  It pushed forward with mediation as scheduled and made no attempt to cancel same.  And it made no offers of settlement.

Furthermore, in an effort to strip Roberto of his claims to "prevailing party" fees, Plaintiff made the very sneaky move of dropping Roberto out of the case by omitting him from the body of Plaintiff's second amended complaint (Doc. 61) despite the fact that the Court had expressly ordered Plaintiff to not do that (Doc. 58 at 2).  Such an action further solidifies Plaintiff's intent to avoid paying "prevailing party" fees and shift the blame.

Finally, in retrospect, after reading Plaintiff's motion for sanctions (the underlined lines at the bottom of page 6), I realized that I did commit a minor oversight by failing to update Roberto's affidavit.  He had originally attested to the truthfulness of the facts in the first draft motion we had made, before obtaining additional evidence from Plaintiff and before I had taken the time to redraft and rewrite.  However, the facts in the revised draft, as to him at least, are basically the same; the differences lie in the structure, language, and legal analysis within the motion, as well as inserting additional information from Plaintiff's discovery responses.  Nothing was fraudulent, and the motion was sufficiently revised.

### D.   Depositions

Plaintiff's hubris and assumptions of what it thinks happened regarding subpoena on Roberto's parents are astonishing and its vitriol, frankly, frightening in that it would accuse

the undersigned of being "unethical" for opposing a subpoena that Plaintiff knew full well exceeded the bounds allowed by the Federal Rules of Civil Procedure.

Above, I mentioned that in the "Miami case," we had scheduled a hearing before Judge O'Sullivan for January 22, 2015.  In that hearing, Judge O'Sullivan agreed with the reasoning in *In re Ford Motor Co.*, which provides that "Rule 34(a) does not grant unrestricted, direct access to a respondent's database compilations." 345 F.3d 1315, 1316-17 (11th Cir. 2003).  Judge O'Sullivan expressly told Malibu Media's attorneys that they did not have the right to have their "expert" search the Defendant's hard drives.

Despite Judge O'Sullivan's order, Plaintiff continues to demand hard drives. However, the very motion that Plaintiff objects as being so unethical was <u>granted</u> by the above court.  See Doc. 70 (Order finding that, "neither Federal Rule of Civil Procedure 34 nor governing Eleventh Circuit authority permit unrestricted access to a party's database compilations and/or computer hard drives.").  Therefore, if any party was in the wrong, in this instance, it was Plaintiff, for making such illegally overreaching and improper discovery requests, even after Judge O'Sullivan had explained to its attorneys that the 11th Circuit did not allow such fishing expeditions.

**E.     Plaintiff should never have requested Angel and Gladys's hard drives**

Plaintiff's section "E" is nothing but histrionics, speculation, and inaccuracies. Plaintiff argues that the motion for protective order was "fraudulent" when in fact, as stated above, its own request for hard drives was completely outside the bounds of the Federal Rules.  It argues that the good-faith conference was fraudulent when it attaches a string of emails admitting that Attorney Shatz and I conferred on the topic and showing that an

amended motion would be filed after Attorneys Shatz and Patrick conferred.  Despite the fact that the email thread occurred on a *Sunday*, Plaintiff seems to chastise me for having "errands" to run during part of that day.  Furthermore, Plaintiff fails to note that an amended joint motion indeed was filed to clear up any discrepancies (Doc. 50).

Finally, it is important to note that Plaintiff continues to improperly make false, unsupported allegations.  It argues, in a footnote, that the production of Angel's hard drive "would have pointed to Angel as the infringer and would have therefore threatened Conlin's ability to manipulate a profit out of this litigation."  This has been said before, and it will be said again: Angel Roldan is not the infringer.  Roberto Roldan is not the infringer.  Angel Roldan's router was *hacked*.  Plaintiff simply has insufficient evidence to show that either party committed the infringement.[6]

If anyone is concerned about the inability to "manipulate a profit out of this litigation," it is Plaintiff, who, despite claiming $150,000 in damages for each of 48 alleged infringements (a total of $7.2 million) is clearly losing.

### G.      The Opposition [54] was necessary to see a dismissal on the merits

 Roberto's opposition to the Motion for leave to switch party defendants was not frivolous and was necessary to preserve Roberto's claims of "prevailing party" fees and to see that a ruling is entered in his favor on the merits.  Moreover, even though the Court expressly ordered Plaintiff not to omit Roberto as a Defendant, Plaintiff did it anyway (see Motion for

---

[6] Plaintiff brings this same issue up again on Page 14, therein alleging that "Conlin's scheme was threatened by her suspicion that Angel was the actual infringer."  Does Plaintiff not think that the undersigned knew that Angel lived in the house from the moment of being retained? Did Plaintiff not see Angel's name as a witness in Roberto's initial disclosures? Why would Roberto through his own father under the bus?  There was never any "suspicion that Angel was the actual infringer" and Plaintiff has no evidence support that misstatement.

Order to Show Cause at Doc. 75).  Plaintiff's section "G" (like much of the rest of its motion) is inaccurate and frivolous.

### V.      **Pot calling the kettle black**

It is ironic that Plaintiff has accused Conlin of "bad faith" when Plaintiff itself has repeatedly made overbroad discovery requests pertaining to hard drives in blatant disregard of the Federal Rules of Civil Procedure and when it itself may be facing sanctions for violating an order of this Court. *See* Doc. 75; *see Hinds v. Credigy Receivables, Inc.*, No. 607CV-1081-ORL-28GJK, 2008 WL 5381345, at *5 (M.D. Fla. Dec. 23, 2008) (citing *Barnes v. Dalton,* 158 F.3d 1212, 1214 (11th Cir. 1998) (A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order.)  Moreover, **Plaintiff itself filed a lawsuit against Roberto Roldan with no sufficient factual basis**.  That in itself — knowingly or recklessly pursing a frivolous claim — is worthy of sanctions more than any action of the undersigned.

The cases Plaintiff cites to are distinguishable, and Plaintiff fails to cite the full reasoning why the attorneys in those case were sanctioned.  For example, in *Gonzalez v. Mortgage Elec. Registration Sys., Inc.*, the magistrate factually concluded that the attorney had "pursued …claims despite being advised of their frivolity"; filed response memoranda that "had no reasonable factual or legal basis" and were "frivolous, incoherent, and shoddy"; and filed multiple frivolous documents, including a "frivolous Amended Complaint," and much more. 595 F. App'x 858 (11th Cir. 2014).  In *Franken v. Mukamal,* the magistrate's findings of fact including that the attorney "repeatedly sought to represent parties with directly opposing interests both in the bankruptcy action and in outside litigation"; "submit[ed] false and misleading documents to the court," and "fil[ed] several frivolous

pleadings without conducting any diligence to determine their legal or factual validity." 449

F. App'x 776, 778 (11th Cir. 2011).  Contrary to these and the other cases Plaintiff cites to, the

instant case is not one where "examples of . . . counsel's bad faith and willful abuse of the

judicial process abound." *Malautea v. Suzuki Motor Co., Ltd.,* 987 F.2d 1536, 1544 (11th Cir.

1993);  *cited by Home Design Servs., Inc. v. Hibiscus Homes of Fla., Inc.*, No.

603CV1860ORL19KRS, 2005 WL 2465020, at *8 (M.D. Fla. Oct. 6, 2005).

Where section 1927 sanctions are at issue, "'[b]ad faith' is the touchstone. Section

1927 is not about mere negligence." *Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225-26

(11th Cir. 2003) (citations omitted).   None of the actions of the undersigned were made in

"bad faith," as Plaintiff improperly concludes.  While some delays or mistakes are bound to

happen and may have happened, all were inadvertent and not worthy of Plaintiff's vitriol.

Section 1927 "was designed to sanction attorneys who 'willfully abuse the judicial process by

conduct tantamount to bad faith.'" *Id.* (citation omitted).   The undersigned engaged in no

"willful" conduct to abuse the judicial process.

Monetary sanctions are an "extreme remedy." *Home Design Servs., Inc*, 2005 WL

2465020, at *8.  To warrant sanctions, the attorney "must *knowingly or recklessly* pursue a

frivolous claim or needlessly obstruct the litigation of a non-frivolous claim." *Doria v. Class

Action Servs., LLC*, 261 F.R.D. 678, 683 (S.D. Fla. 2009) (citing *Amlong & Amlong,* 500 F.3d

at 1242).

WHEREFORE, the undersigned finds that this Court DENY Defendant's motion and,

pursuant to 28 U.S.C. § 1927, require Plaintiff to compensate her for reasonable attorney fees

necessary to prepare this response.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on **April 8, 2015**, I filed electronically the foregoing with the Clerk of the Court via CM/ECF system which will notify all persons authorized to receive notices of electronic filing.

*Attorney for (former) Defendant:*

**Cynthia Conlin, P.A.**
543 Hillcrest Street
Orlando, Florida 32803-4809
Tel. 405-965-5519
Fax 405-545-4395
www.conlinpa.com

<u>/s/ Cynthia Conlin, Esq.</u>
Cynthia CONLIN, ESQ.
Florida Bar No. 47012
Cynthia@cynthiaconlin.com
Jeff@cynthiaconlin.com